OPINION *Page 2 
{¶ 1} Defendant-appellant Timothy McCroskey appeals his conviction and sentence entered by the Stark County Court of Common Pleas on one count of aggravated murder with a firearms specification, and one count of having weapons under disability, following a jury trial. Plaintiff-appellee is the State of Ohio.
 STATEMENT OF THE CASE AND FACTS {¶ 2} On December 18, 2006, the Stark County Grand Jury indicted Appellant on one count of aggravated murder with a firearm specification, in violation of R.C. 2903.01(A); and one count of having weapons while under disability, in violation of R.C. 2923.13(A)(3). Appellant appeared before the trial court for arraignment and entered a plea of not guilty to the Indictment. Appellant filed a Motion to Suppress, in which he sought to suppress the pretrial identification procedure used by the police, arguing such was impermissibly suggestive. The trial court conducted a hearing on the motion.
 {¶ 3} At the suppression hearing, Victor George, a detective with the Canton Police Department, testified he became involved with the investigation of a homicide which occurred in late August, 2006, at the Old Timers' Club in Canton, Ohio. As part of the investigation, Det. George compiled a photo lineup in order to identify potential suspects in the matter. Several witnesses at the scene could identify the suspect, who was determined to be Appellant. However, the witnesses only knew Appellant by a street name. Officers were able to determine Appellant's surname using a database. At the Stark County Jail, Det. George compiled an array of photos of individuals who looked similar to Appellant. The detective noted one of the specific identifying features of Appellant, as described by witnesses, was his dreadlocks. The picture of Appellant *Page 3 
Det. George chose for the array did not depict him with dreadlocks. Det. George showed the photo array to several witnesses later the same day as the shooting. All of the witnesses identified the individual in photo number three, who was Appellant, as the perpetrator.
 {¶ 4} On cross-examination, Det. George explained, although he did have a photo of Appellant with dreadlocks, as well as database photos of at least five other individuals with dreadlocks, he did not include those photos in the array as the individuals in the other photos did not possess other facial features similar to Appellant. Counsel for Appellant questioned Det. George about the difference in the background color of Appellant's photo and that of the other individuals in the lineup, as well as the clothing and skin tone of Appellant versus the other individuals. Det. George noted all of the witnesses who were to view the photo lineup were segregated from one another, and remained so until the identification procedure was complete. On redirect, the detective acknowledged the backgrounds of the individual photos are of varying hues. He added none of the individuals were wearing bright clothing or anything which would draw the eye to that specific person in the lineup.
 {¶ 5} Sgt. Dan McCartney, a detective with the Canton Police Department, testified he worked with Det. George on the investigation. Through the course of the investigation, Sgt. McCartney presented a photo lineup to an individual by the name of DeShawna Petties. On cross-examination, Sgt. McCartney stated when he reviewed the photo lineup compiled by Det. George he did not have any concerns about the appearance of such. He added he did not have any concerns Appellant's photo might "Jump off the page" when shown to Petties. *Page 4 
 {¶ 6} At the conclusion of the hearing, the trial court found the photo array was not impermissibly suggestive and denied Appellant's motion. The matter proceeded to jury trial on February 12, 2007. Appellant waived his right to jury trial on the having weapons under disability count.
 {¶ 7} The evidence adduced at trial is as follows. After attending a wedding reception on the evening of August 27, 2006, Charles Ellis, DeShawna Petties, Daphne Degraffenried, and Essence Alston met at the Canton Negro Old Timers Club. While at the club, Alston and Ellis were dancing when a man known to Alston as "Torchie"[1] bumped in to her three times. Alston did not believe the bumping was accidental and turned to look at Johnson. Ellis also noticed Johnson bumping into Alston, and said something to the other man. Johnson and Ellis began to argue. Alston attempted to calm Ellis. She turned to Johnson and advised him everything was "cool" and to "just forget it." At that point, a man known as "Mook", who was subsequently identified as Appellant, walked onto the dance floor and became involved in the situation. Appellant and Ellis entered into a verbal altercation which ultimately became physical.
 {¶ 8} Degraffenried, who was seated near the dance floor when the fight began, observed Appellant attempt to hit Ellis with a bottle. She then saw Ellis throw Appellant to the ground. Security guards arrived and broke up the fight, escorting Appellant and Johnson outside. Approximately ten to fifteen minutes later, security guards had Ellis exit through the doors at the other end of the building. It was approximately 1:45 a.m., and closing time for the bar. *Page 5 
 {¶ 9} Once outside, Degraffenried and Alston noticed Appellant had not left the premises. Appellant began to verbally taunt Ellis, attempting to engage him in another physical altercation. Ellis reentered the club to locate his lost watch. Alston joined him. Degraffenried proceeded to Ellis' van and moved the vehicle to the south end of the parking lot.
 {¶ 10} Inside the club, Ellis met his friend, Glenn White. Ellis, White and Alston exited the bar together. Appellant and Johnson were still outside the premises. Appellant again engaged in a verbal confrontation with Ellis. While Appellant and Ellis were arguing, White heard Johnson telling the person with whom he was speaking on his cell phone, "You need to come down here, you need to bring it, you need to hurry." After a few minutes, Ellis walked away from Appellant and Johnson. Believing the situation was over, Alston walked to her car. After Ellis walked away, DeShawna Petties noticed Appellant talking on his cell phone, and heard him say, "Bring me the fire, bring me the fire because I'm about to do this nigger."
 {¶ 11} While all this was going on, Migel Flowers arrived at the club to pick up his wife. His wife advised him there had been a fight and pointed to Appellant, who was standing near one of the club doors, as one of the people involved. Although Flowers did not know Appellant's name, he recognized Appellant from seeing him around at a neighborhood gas station. Flowers was familiar with Ellis as well.
 {¶ 12} Ellis proceeded to his van. Degraffenried exited the van and instructed Ellis to get inside. Ellis stated he would not leave without Alston and asked Degraffenried to find her. Degraffenried found Alston in her car, talking on her cell phone. Degraffenried entered Alston's vehicle. *Page 6 
 {¶ 13} A silver gray Monte Carlo sped up next to Flower's truck. Flower's saw Appellant run to the vehicle as a man exited. Appellant and the man stood chest to chest, and exchanged something. Flower's then observed Appellant, in a crouched position, running down the street. White heard someone yell, "He's got a gun!", and observed Appellant, holding a gun, run by and crouch behind vehicles. Degraffenried, while entering Alston's car, saw Appellant run toward Ellis. Pointing, Degraffenried told Alston, "He's got a gun, he's going to kill him." As the words left Degraffenried's mouth, Appellant fired and she and Alston observed Ellis fall to his knees. The two women exited the vehicle and ran toward Ellis.
 {¶ 14} Both White and Flowers heard five or six shots. White watched Appellant take Ellis by surprise and continue to fire after Ellis fell to the ground. White and Flowers observed Appellant run to the Monte Carlo, jump in and speed away. Flowers noticed the gun in Appellant's hand as he entered the Monte Carlo. Flowers noticed the slide of the gun was all the way back, which he knew from his military experience meant the weapon was a semi-automatic and the clip had been emptied of ammunition. White and Petties chased after the car on foot in order to obtain the license plate. Thereafter, they called 9-1-1. According to the Canton Police Department records, the time was 2:09am.
 {¶ 15} Canton Police Officer Allan Fout was first to arrive on the scene, and upon seeing Ellis lying on the street, called for backup and an ambulance. Officer Fout saw Ellis has been shot three times, once in the ankle, once in the shoulder, and once in the neck. The officer attempted to administer first aid. Emergency personnel transported Ellis to Aultman Hospital where he subsequently died. Officer Randy Weirich with the *Page 7 
Canton Police Department Identification Bureau, arrived at the scene at 2:20am. Officer Weirich collected and photographed potential evidence. He located seven shell casings within a 30 to 35 foot area of the parking lot, in a mulch bed beside the parking lot, and in the street. Weirich also found an aluminum baseball bat 18 to 20 feet away from a large pool of blood which had collected in the street. On the dance floor inside the club, Weirich recovered multiple braids of hair.
 {¶ 16} Detective Victor George responded to Aultman Hospital, but by the time he arrived, Ellis was dead. Det. George investigated and collected information as to the identity of the shooter. Witnesses described the suspect as a black male with dreadlocks who went by the street name "Mook". Det. George subsequently learned the suspect's name was "Timothy McCroskey". The detective compiled a photo lineup of Appellant and another photo lineup of the co-defendant. George showed the lineup to six witnesses, including Petties and McEwin. McEwin identified Appellant as the individual with dreadlocks he had escorted out of the club. Petties identified Appellant as the shooter. Petties knew of Appellant prior to the shooting, however, did not know his name.
 {¶ 17} A warrant was issued for Appellant's arrest. Efforts were made to find the vehicle in which Appellant had fled the scene based upon the license plate number obtained by witnesses. Neither the car nor the Appellant were located at the address listed on the registration. Det. George subsequently enlisted assistance from the FBI's Violent Crimes Fugitive Task Force, which located Appellant in Tennessee in November, 2006. *Page 8 
 {¶ 18} Dr. P.S. Murthy, the Stark County Coroner, performed the autopsy of Ellis. He found Ellis had sustained three gunshot wounds. One bullet entered Ellis' left upper neck and exited the right side of his face; another entered and exited his upper left arm; and the third entered his lower right leg, but did not exit. Dr. Murthy determined the neck wound Ellis sustained was fatal.
 {¶ 19} Criminalist Michael Short with the Canton-Stark County Crime Lab conducted tests on the shell casings found at the crime scene as well as the bullet and jacket extricated from Ellis' leg. Short determined the shell casings all came from a .45 caliber semi-automatic weapon. DNA testing performed on the hair braids found on the dance floor of the club revealed the braids had been forcibly removed and belonged to Appellant.
 {¶ 20} After hearing all the evidence and deliberations, the jury found Appellant guilty of aggravated murder with a firearm specification. The trial court found Appellant guilty of having weapons under disability. The trial court sentenced Appellant to life without the possibility of parole on the aggravated murder charge and attendant firearm specification, and five years on the weapons charge. The trial court ordered the sentenced be served consecutively.
 {¶ 21} It is from this conviction and sentence Appellant appeals, raising the following assignments of error:
 {¶ 22} "I. THE TRIAL COURT ERRED BY NOT GRANTING THE APPELLANT'S MOTION TO SUPPRESS THE OUT OF COURT IDENTIFICATION AS UNNECESSARILY SUGGESTIVE. *Page 9 
 {¶ 23} "II. THE TRIAL COURT ERRED IN ADMITTING AUTOPSY PHOTOGRAPHS WHICH WERE UNFAIRLY PREJUDICIAL TO THE APPELLANT.
 {¶ 24} "III. THE TRIAL COURT'S FINDING OF GUILTY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE."
 I {¶ 25} In his first assignment of error, Appellant contends the trial court erred in failing to grant his motion to suppress the out of court identification. Specifically, Appellant asserts the photo array shown to witnesses was unnecessarily suggestive.
 {¶ 26} There are three methods of challenging on appeal a trial court's ruling on a motion to suppress. First, an appellant may challenge the trial court's findings of fact. In reviewing a challenge of this nature, an appellate court must determine whether said findings of fact are against the manifest weight of the evidence. State v.Fanning (1982), 1 Ohio St.3d 19; State v. Klein (1991),73 Ohio App.3d 485; State v. Guysinger (1993), 86 Ohio App.3d 592. Second, an appellant may argue the trial court failed to apply the appropriate test or correct law to the findings of fact. In that case, an appellate court can reverse the trial court for committing an error of law. State v.Williams (1993), 86 Ohio App.3d 37. Finally, assuming the trial court's findings of fact are not against the manifest weight of the evidence and it has properly identified the law to be applied, an appellant may argue the trial court has incorrectly decided the ultimate or final issue raised in the motion to suppress. When reviewing this type of claim, an appellate court must independently determine, without deference to the trial court's conclusion, whether the facts meet the appropriate legal standard in any given case. State v. Curry (1994), *Page 10 95 Ohio App.3d 93; State v. Claytor (1993), 85 Ohio App.3d 623;Guysinger. As the United States Supreme Court held in Ornelas v.U.S. (1996), 116 S.Ct. 1657, 1663, ". . . as a general matter determinations of reasonable suspicion and probable cause should be reviewed de novo on appeal."
 {¶ 27} Appellant argues the witnesses' identifications of him should have been excluded because the photo array did not depict men with dreadlocks, which he wore at the time of the offense. Appellant further asserts the background of his photo is different from the backgrounds in the other photos, causing the eye to be drawn to his picture.
 {¶ 28} When a witness is shown a photograph of a suspect before trial, due process requires a court to suppress a photo identification of the suspect if the photo array was unnecessarily suggestive of the suspect's guilt and the identification was not reliable. State v. Waddy (1992),63 Ohio St.3d 424, 438, superseded by constitutional amendment on other grounds. The defendant has the burden to show that the identification procedure was unduly suggestive. State v. Harris, 2d Dist. No. 19796,2004-Ohio-3570, ¶ 19. If the defendant meets that burden, the court must then consider whether the identification, viewed under the totality of the circumstances, is reliable despite its suggestive character.Id., citing State v. Wills (1997), 120 Ohio App.3d 320, 324.
 {¶ 29} If the pretrial confrontation procedure was not unduly suggestive, any remaining questions as to reliability go to the weight of the identification, not its admissibility, and no further inquiry into the reliability of the identification is required. Id. at 325. If the court finds the procedure is suggestive, then it must assess the reliability of the identification, considering: (1) the witness's opportunity to view the defendant at *Page 11 
the time of the incident, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description, (4) the witness's certainty when identifying the suspect at the time of the confrontation, and (5) the length of time elapsed between the crime and the identification.State v. Davis (1996), 76 Ohio St .3d 107, 113. A photo array, "created by police prior to the victim giving a description of the suspect, * * * is not unreasonably suggestive, as long as the array containsindividuals with features similar to the suspect." (Emphasis added.)State v. Jones, 8th Dist. No. 85025, 2005-Ohio-2620, ¶ 15.
 {¶ 30} A defendant in a lineup need not be surrounded by people nearly identical in appearance. State v. Davis (1996), 76 Ohio St.3d 107, 112,666 N.E.2d 1099. Where the other men depicted in the photo array with the defendant all appear relatively similar in age, features, skin tone, facial hair, dress, and photo background, the photo array is not impermissibly suggestive. State v. Jacobs, Mahoning Appellate No. 99-CA-110, 2002-Ohio-5240 .
 {¶ 31} In the instant case, the photo array depicted men sharing similar physical characteristics with Appellant. The array contains six pictures of males of the same race as Appellant, and, in each of the pictures, the skin color, age, and facial features of the other men are similar to those of Appellant. In fact, Det. George explained, at the suppression hearing, he purposely did not use photos of men with dreadlocks because those individuals did not share other similarities to Appellant.
 {¶ 32} We find Appellant failed to demonstrate the pre-trial identification procedure was unnecessarily suggestive. Assuming, arguendo, the procedure was unnecessarily suggestive, we find, under the totality of the circumstances, the *Page 12 
identifications were reliable. The witnesses had ample opportunity to observe Appellant during his rampage inside and outside of the club. Because of the intensity of the situation, the witnesses were intently focused on Appellant. The witnesses knew Appellant and identified him with absolute certainty. Finally, the police showed the photo array to the witnesses within hours of the events.
 {¶ 33} Based upon the foregoing, we overrule Appellant's first assignment of error.
 II {¶ 34} In his second assignment of error, Appellant contends the trial court erred in admitting autopsy photographs as such were unfairly prejudicial.
 {¶ 35} Evid. R. 403(A) manifests a definite bias in favor of the admission of relevant evidence. In order to reject relevant evidence, the dangers associated with the potentially inflammatory nature of the evidence must substantially outweigh its probative value. It is well settled that the admission of photographs is left to the discretion of the trial court. State v. Smith, (1997), 80 Ohio St.3d 89,1997-Ohio-355, 684 N.E.2d 668, "[Although a trial court may reject a photograph, otherwise admissible, due to its inflammatory nature * * * the mere fact that a photograph is gruesome or horrendous is not sufficient to render it per se inadmissible" pursuant to Evid. R. 403(A).State v. Maurer (1984), 15 Ohio St.3d 239, 264-265, 473 N.E.2d 768; see also, State v. Woodards (1966), 6 Ohio St.2d 14, 25, 215 N.E.2d 568.
 {¶ 36} The trial court's decision to admit evidence will not be reversed unless the court has clearly abused its discretion and the defendant has been materially prejudiced thereby. State v. Slagle
(1992), 65 Ohio St.3d 597, 602, 605 N.E.2d 916. See also, *Page 13 State v. Hymore (1967), 9 Ohio St.2d 122, 128, 224 N.E.2d 126. An abuse of discretion involves more than an error of judgment; it connotes an attitude on the part of the trial court that is unreasonable, unconscionable, or arbitrary. Franklin Cty. Sheriff's Dept. v. StateEmp. Relations Bd. (1992), 63 Ohio St.3d 498, 506, 589 N.E.2d 24.
 {¶ 37} In State v. Maurer (1984), 15 Ohio St.3d 239, 264-265, the Ohio Supreme Court explained:
 {¶ 38} "To be certain, a trial court may reject a photograph, otherwise admissible, due to its inflammatory nature if on balance the prejudice outweighs the relevant probative value. However, the mere fact that a photograph is gruesome or horrendous is not sufficient to render it per se inadmissible. State v. Woodards (1966), 6 Ohio St.2d 14, 25 * * *. The trial court has broad discretion in the admission * * * of evidence and unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby, this court should be slow to interfere.' State v. Hymore (1967), 9 Ohio St.2d 122, 128."
 {¶ 39} Appellant submits the photographs of Ellis' non-fatal shoulder and leg wounds had no probative value; therefore, the trial court erred in admitting such. We disagree.
 {¶ 40} In State v. Gross, 97 Ohio St.3d 121, 776 N.E.2d 1061,2002-Ohio-5524, the Ohio Supreme Court articulated the useful purpose of photographs:
 {¶ 41} "The photographs serve purposes that we have time and again found sufficiently probative to overcome their inherently disturbing nature. They helped the jury appreciate the nature of the crimes, they illustrated the coroner's testimony, and, by *Page 14 
portraying the wounds, they helped to prove [the defendant's] intent and the lack of accident or mistake." Id. at ¶ 52.
 {¶ 42} We have reviewed each photograph and find each one exhibits a wound not readily apparent in any other photograph. Thus, the relevancy and probative value of each admitted photo satisfied the Maurer
standard. We further find the trial court only admitted 14 of the 99 autopsy photos; therefore, not allowing such to become cumulative. However, even if the trial court erred in admitting the autopsy photographs into evidence, we find such did not prejudice Appellant given the overwhelming evidence of his guilt.
 {¶ 43} Appellant's second assignment of error is overruled.
 III {¶ 44} In his final assignment of error, Appellant challenges the jury's guilty verdict as against the manifest weight and sufficiency of the evidence.
 {¶ 45} In State v. Jenks (1981), 61 Ohio St.3d 259, 574 N .E.2d492, the Ohio Supreme Court set forth the standard of review when a claim of insufficiency of the evidence is made. The Ohio Supreme Court held: "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Id. at paragraph two of the syllabus. *Page 15 
 {¶ 46} On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. The discretionary power to grant a new hearing should be exercised only in the exceptional case in which the evidence weighs heavily against the judgment." State v. Thompkins, 78 Ohio St.3d 380,387, 678 N.E.2d 541, 1997-Ohio-52, citing State v. Martin (1983),20 Ohio App.3d 172, 175, 485 N.E.2d 717. Because the trier of fact is in a better position to observe the witnesses' demeanor and weigh their credibility, the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. State v. DeHass (1967),10 Ohio St.2d 230, 227 N.E.2d 212, syllabus 1.
 {¶ 47} Appellant was convicted of aggravated murder, in violation of R.C. 2903.01(A), which reads:
 {¶ 48} "(A) No person shall purposely, and with prior calculation and design, cause the death of another or the unlawful termination of another's pregnancy."
 {¶ 49} Appellant suggests three reasons why his conviction was not supported by the manifest weight or sufficiency of the evidence. First, Appellant submits the witnesses only knew Appellant by his street name, if at all, and their descriptions of the events of August 27, 2006, were inconsistent. Next, Appellant argues the photo arrays shown to the witnesses on the night of the shooting were unduly suggestive, and only two of the six witnesses who were actually shown the array testified at trial. Finally, *Page 16 
Appellant submits evidence was presented which negated the element of "prior calculation and design" as required for a conviction under R.C. 2903.01(A).
 {¶ 50} Appellant contends the witnesses gave inconsistent testimony. Appellant does not indicate how or why these inconsistencies affected the weight or sufficiency of the evidence. The inconsistencies to which Appellant refers are minor. For example, Appellant states Alston testified the original confrontation was between Johnson and Ellis, while Degraffenried testified the original dance floor confrontation involved Appellant and Ellis. Another inconsistency Appellant references is Petties' testimony Appellant made a call on his cell phone just prior to the shooting, while White and McEwin only saw Johnson on a cell phone prior to the shooting. We find minor inconsistencies between the testimony of witnesses goes to the credibility of each witness and is a matter of the trier of fact to resolve. The inconsistency as to whom was involved in the original confrontation on the dance floor is immaterial to the jury's finding Appellant guilty of aggravated murder. The record shows no inconsistencies as to the ultimate issue as to whom shot Ellis.
 {¶ 51} Within this assignment of error, Appellant again takes issue with the photo array, asserting such was unnecessarily suggestive. We have reviewed this argument and found otherwise in assignment of error one, supra. Even if the array was unnecessarily suggestive, we find such did not prejudice Appellant; therefore, could not have negatively influenced the jury's weighing of the evidence.
 {¶ 52} Finally, Appellant submits the State failed to prove beyond a reasonable doubt he acted with "prior calculation and design." Appellant argues the shooting *Page 17 
occurred during an "almost instantaneous eruption of events" from the initial fight on the dance floor until the fatal altercation outside the club. We disagree.
 {¶ 53} Prior calculation and design requires a scheme designed to implement the calculated decision to kill. State v. Cotton (1978),56 Ohio St.2d 8, paragraph 2 of the syllabus. There is no bright line test as each case depends upon the particular facts and circumstances existing therein. State v. Taylor (1997), 78 Ohio St.3d 15, 19-20.
 {¶ 54} After the fight on the dance floor, Appellant and Johnson were escorted out of the club. The two men remained outside the club and waited for Ellis. Ten to fifteen minutes later, Ellis and his friends exited the club from a door at the opposite end of the building from which Appellant had exited. Appellant sought out Ellis and began a verbal confrontation. Ellis went back inside the club, and Appellant again waited outside. When Ellis exited the club a second time, Appellant engaged in another verbal confrontation with Ellis. Johnson was on his cell phone, instructing someone to "bring it" and to hurry. Ellis walked away from the situation and went to his vehicle. Appellant placed a cell phone call, instructing the person on the other end of the line to "bring me the fire because I'm about to do this nigger". Tr. 3 at 174. Appellant waited between 10 and 20 minutes when someone arrived in a silver gray Monte Carlo. After a discussion with the driver, Appellant brandished a gun. Appellant then dodged between vehicles as he approached Ellis.
 {¶ 55} We find the time frame between the original altercation on the dance floor and the shooting (approximately 30 minutes) as well as Appellant's action of remaining on the premises in wait was sufficient for the jury to find he acted with prior calculation and design. *Page 18 
 {¶ 56} Based upon the foregoing and the entire record in this matter, we find Appellant's conviction was neither against the manifest weight nor the sufficiency of the evidence.
 {¶ 57} Appellant's third assignment of error is overruled.
 {¶ 58} The judgment of the Stark County Court of Common Pleas is affirmed.
 Hoffman, P.J. Wise, J. and Delaney, J. concur. *Page 19 
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Stark County Court of Common Pleas is affirmed. Costs assessed to Appellant.
[1] "Torchie" was subsequently identified as Lagendrius Johnson, Appellant's co-defendant. *Page 1