[Cite as *State v. Garvin*, 197 Ohio App.3d 453, 2011-Ohio-6617.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
SCIOTO COUNTY

| | | |
|---|---|---|
| THE STATE OF OHIO, | : | |
| | : | |
| Appellee, | : | Case No. 10CA3348 |
| | : | |
| v. | : | **Released: December 5, 2011** |
| | : | |
| GARVIN, | : | DECISION AND JUDGMENT |
| | : | ENTRY |
| Appellant. | : | |

APPEARANCES:

Timothy Young, Ohio Public Defender, and Claire R. Cahoon and Terrence Scott, Assistant Public Defenders, for appellant.

Mark Kuhn, Scioto County Prosecuting Attorney, and Pat Apel, Assistant Prosecuting Attorney, for appellee.

MCFARLAND, Judge.

{¶ 1} Appellant, Kara Garvin, appeals her conviction in the Scioto County Court of Common Pleas after a jury found her guilty of one count of aggravated burglary, two counts of aggravated robbery, six counts of aggravated murder with specifications, tampering with evidence, and a firearm specification. Although this was originally a capital case, the trial court sentenced appellant to life in prison without the possibility of parole.

{¶ 2} Appellant raises four assignments of error, arguing that (1) the trial court erred by failing to suppress eyewitness identifications of her, denying her due

process, (2) the trial court erred by failing to change the venue because of pretrial publicity, denying appellant due process and a fair trial, (3) the trial court erred by failing to question a juror about her relationship with the county sheriff, denying appellant due process and a fair trial, and (4) trial counsel provided ineffective assistance when they failed to inquire further or object to the seating of the juror who was related to the county sheriff.  Having reviewed the record, we find no merit to appellant's four assignments of error, and we affirm the trial court's judgment.

## FACTS

{¶ 3}  Edward Mollett, Juanita Mollett, and Christina Mollett were shot to death on December 22, 2008.  A.S., a six-year-old child, was present during the shooting.  According to A.S., a woman with dark hair and a vest containing knives and guns entered the Molletts' trailer in Scioto County, Ohio, and began systematically shooting the Molletts.  Christina Mollett lay on top of A.S. to shield him.  Once the shooting ceased, the dark-haired woman took Edward Mollett's prescription medication and left.  A.S. then ran to a neighbor's trailer.

{¶ 4}  The neighbor, James Damron, called 9-1-1, and law enforcement arrived.  In addition to law enforcement, family members and other neighbors gathered at Damron's trailer.  Detective Paul Blaine of the Scioto County Sheriff's Department began questioning A.S. and Damron.

{¶ 5} Damron indicated that he had seen a vehicle drive up to the Molletts' trailer before the shooting and drive away immediately thereafter. Damron could not initially identify the driver of the vehicle, other than saying that it was a female with dark hair.

{¶ 6} A.S. had indicated that a woman with dark hair had shot his family. Detective Blaine asked additional questions about the shooter's appearance. To get a better understanding, Blaine had A.S. compare the physical characteristics of the shooter to those of the women present at Damron's trailer. While Blaine was talking with A.S., other law-enforcement officers began to suspect that appellant was involved in the shooting.

{¶ 7} A.S.'s mother subsequently transported him to the hospital for an evaluation, concerned that he might have been going into shock. Detective Blaine went back to his office and began compiling a photo array. Blaine began with appellant's photo, because she was the only suspect at that time. He had access to appellant's photo because she had previously been booked into the jail. Blaine then entered appellant's physical characteristics into a computer program that gave him a resulting pool of photos of women whose physical characteristics were similar. These women had also previously been booked into the jail. Blaine manually chose five photos similar to appellant's. The final array contained color photos of six women, including appellant.

{¶ 8} Detective Blaine took the completed array to the hospital to show A.S. While A.S. was looking at the array on his mother's lap, his mother began to coax him to pay attention to the women's hair. Not wanting A.S.'s identification to be tainted, Blaine moved A.S. to a corner and continued showing him the photo array. A.S. identified appellant as the person who shot his family, and he signed his name on appellant's photo.

{¶ 9} Later that evening, appellant, with the assistance of counsel, surrendered to law enforcement. As deputies booked appellant into the Scioto County jail, they photographed her.

{¶ 10} The following day, Detective Blaine went to speak with Damron about identifying the person he had seen driving the vehicle away from the crime scene. Blaine asked Captain David Hall to prepare another photo array to show Damron. Using the same software that Blaine had employed before, Hall compiled a second photo array. This array, however, used appellant's booking photo from the previous night.

{¶ 11} Before Captain Hall gave the photo array to Detective Blaine, he asked Damron whether he had been watching the news or had read the paper. Damron responded that he had not. When Blaine presented the photo array to Damron, Damron immediately identified appellant's photo.

{¶ 12} When later questioned about how he went from being unable to identify the driver on the day of the incident to immediately identifying her the day after, Damron explained that he was familiar with appellant.  His daughter had known appellant for more than 10 years, and Damron had seen appellant at social gatherings.  It was not that he did not remember what the driver of the vehicle looked like, but Damron was bad with names; he initially stated that he knew the driver's face, but not her name.  Presented with the photo array, Damron was easily able to identify the woman he had seen leaving the crime scene: appellant.

{¶ 13} Appellant filed a plethora of pretrial motions.  Among these, appellant moved to suppress A.S.'s  and Damron's identification testimony as unduly suggestive and unreliable.  The trial court held a suppression hearing and ultimately overruled appellant's motion.  Before the trial court issued its ruling, appellant withdrew her motion regarding A.S.  She later renewed her motion as to A.S., and the trial court denied it.

{¶ 14} Beginning the day after the shooting, there were news reports concerning the incident.  The shootings were a topic of discussion among county residents.  The news articles relayed the names of the victims, noted that appellant was the main suspect, noted that appellant was in custody after surrendering herself, and alleged motives for the shootings.  The media also covered pretrial proceedings and were present during the trial.  Several stories were published

immediately before trial, noting the impending jury selection and reminding readers and viewers of the case's subject matter.

{¶ 15} When the trial began, the court bifurcated the voir dire process. Initially, the court and counsel inquired of the veniremen individually. There were preliminary examinations of persons wishing to be excused for medical or educational reasons. The court then proceeded to inquire of the veniremen about their qualifications to serve as jurors in a capital trial, as well as the extent of their exposure to pretrial media and its effect upon their ability to be fair and impartial. Counsel examined the veniremen, too. Subsequently, the court conducted the general voir dire, which was performed with groups of veniremen, not individually.

{¶ 16} During the initial voir dire, the court and counsel examined approximately 106 veniremen about whether they had read, seen, or heard media reports about the case. Eighty-five of those veniremen (over 80 percent) responded that they had. Only seven persons were dismissed for cause because they evinced a preconceived opinion of appellant's guilt based upon media reports. Fifty-eight veniremen remained for the general voir dire, with 45 (over 77 percent) having been exposed to pretrial media reports concerning the case.

{¶ 17} The remaining 58 veniremen included Miriam Clausing. Clausing had disclosed on her questionnaire that she was the first cousin of the Scioto

County Sheriff. It was the sheriff's department that had investigated the Molletts' deaths. The court inquired how close Clausing was to the sheriff, but did not ask whether her relationship would influence her ability to be fair and impartial. Appellant's counsel had an opportunity to question Clausing, but they too did not question her ability to be fair and impartial and raised no causal challenge. Even during the general voir dire, appellant's counsel did not question Clausing's ability to be impartial and did not raise a causal challenge. Clausing was eventually seated on the jury and served as the foreperson during deliberations.

{¶ 18} After the presentation of evidence, the jury found appellant guilty of aggravated burglary, multiple counts of aggravated robbery, multiple counts of aggravated murder, tampering with evidence, a firearm specification, and many other specifications. The jury did not sentence appellant to death, but chose instead imprisonment for life without the possibility of parole. Appellant now appeals.

ASSIGNMENTS OF ERROR

I. The pretrial photographic procedure was so unnecessarily suggestive and conducive to misidentification that Ms. Garvin was denied the due process of law.

II.  The trial court violated Ms. Garvin's constitutional rights to due process and a fair trial by denying Ms. Garvin a change of venue based on pretrial publicity.

III.  The trial court violated Ms. Garvin's constitutional rights to due process and a fair trial by failing to question a juror about whether her relationship to the county sheriff would affect her ability to be fair and unbiased.

IV.  Trial counsel provided constitutionally ineffective assistance when counsel failed to question or object to a prospective juror who was the first cousin of the county sheriff.

## I. Pretrial Identification

{¶ 19} In her first assignment of error, appellant argues that the trial court erred when it permitted A.S. and Damron to testify to their pretrial identification of appellant.  Appellant contends that the pretrial identification procedures were unnecessarily suggestive and the witnesses' identifications were unreliable.  We disagree.

## A. Standard of Review

{¶ 20} "Appellate review of a motion to suppress presents a mixed question of law and fact.  When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual

questions and evaluate the credibility of witnesses." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, at ¶ 8, citing *State v. Mills* (1992), 62 Ohio St.3d 357, 366, 582 N.E.2d 972. "Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." Id., citing *State v. Fanning* (1982), 1 Ohio St.3d 19, 437 N.E.2d 583. "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." Id., citing *State v. McNamara* (1997), 124 Ohio App.3d 706, 707 N.E.2d 539. See also *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, 850 N.E.2d 1168, at ¶ 100.

{¶ 21} "Where factual issues are involved in determining a motion, the court shall state its essential findings on the record." Crim.R. 12(F). While the trial court made no explicit factual findings when it denied appellant's motion to exclude the testimony of A.S. and Damron, "[t]he extensive record of the suppression hearing is 'sufficient to allow full review of the suppression issues.' " *State v. Sapp*, 105 Ohio St.3d 104, 2004-Ohio-7008, 822 N.E.2d 1239, at ¶ 96, quoting *State v. Waddy* (1992), 63 Ohio St.3d 424, 443, 588 N.E.2d 819, citing *State v. Brewer* (1990), 48 Ohio St.3d 50, 60, 549 N.E.2d 491.

## B. Legal Analysis

**{¶ 22}** "When a witness has been confronted with a suspect before trial, due process requires a court to suppress her identification of the suspect if the confrontation was unnecessarily suggestive of the suspect's guilt and the identification was unreliable under all the circumstances." *Waddy* at 438, citing *Neil v. Biggers* (1972), 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401, and *Manson v. Brathwaite* (1977), 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140.

**{¶ 23}** "Under *Neil*'s two-pronged test, the first question is whether the identification procedure was unnecessarily suggestive." *Waddy* at 438. A defendant has "the burden of going forward and the burden of persuasion" to establish, by a preponderance of the evidence, that a pretrial identification procedure was unnecessarily suggestive. *State v. Greene* (Apr. 12, 1979), 4th Dist. No. 1211, 1979 WL 206802. See also *State v. McCroskey*, 5th Dist. No. 2007CA89, 2008-Ohio-2534, ¶ 28; *State v. Wills* (1997), 120 Ohio App.3d 320, 324, 697 N.E.2d 1072; *State v. Bauldwin*, 8th Dist. No. 94876, 2011-Ohio-1066, at ¶ 36; *State v. Justice*, 2d Dist. No. 23744, 2010-Ohio-6484, at ¶ 16; *State v. Banks*, 10th Dist. Nos. 09AP-1087 and 09AP-1088, 2010-Ohio-5714. If the defendant fails to establish that the pretrial identification was unnecessarily suggestive, our inquiry ends. *Waddy* at 439 (continuing to the second prong of the *Neil* test because the identification procedure was unnecessarily suggestive). See *State v.*

*Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, at ¶ 19

(emphasizing that suppression occurs only with *both* unnecessary suggestiveness

*and* unreliability under the totality of the circumstances).  See also *State v. Ruark*,

10th Dist. No. 10AP-50, 2011-Ohio-2225, at ¶ 54; *State v. Levingston*, 1st Dist.

No. C-090235, 2011-Ohio-1665, at ¶ 8; *Bauldwin* at ¶ 36. "[A]s long as pretrial

identification procedures are not unduly suggestive, issues concerning the

reliability of that identification [go] to the weight of the evidence, not its

admissibility." *State v. Conley*, 4th Dist. No. 08CA784, 2009-Ohio-1848, at ¶ 9,

citing *Wills* at 324, and *McCroskey* at ¶ 29.

{¶ 24} "Suggestiveness depends on several factors, including the size of the

array, its manner of presentation, and its contents." *Bauldwin* at ¶ 36,citing *Wills*

at 325.  Regarding the array's contents, courts should consider, amongst other

factors, whether the persons in the array with the defendant "appear relatively

similar in age, features, skin tone, * * * dress, and photo background." *McCroskey*

at ¶ 30.

{¶ 25} If the pretrial identification procedure is unnecessarily suggestive, the

second question is "whether, under all the circumstances, the identification was

reliable, *i.e.,* whether suggestive procedures created ' "a very substantial likelihood

of irreparable misidentification." ' " *Waddy*, 63 Ohio St.3d at 439, 588 N.E.2d

819, quoting *Neil*, 409 U.S. at 198, 93 S.Ct. 375, 34 L.Ed.2d 401, quoting *Simmons*

*v. United States* (1968), 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247. "In evaluating whether the procedure created a very substantial likelihood of irreparable misidentification, courts should look to the following key factors: (1) the witness's opportunity to view (or, in the case of a voice identification, to hear) the defendant during the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the suspect, (4) the witness's certainty, and (5) the time elapsed between the crime and the identification." *State v. Dickess*, 4th Dist. No. 06CA3128, 2008-Ohio-39, at ¶ 24, citing *Waddy* at 439, citing *Neil,* 409 U.S. at 199-200, 93 S.Ct. 375, 34 L.Ed.2d 401.

{¶ 26} Here, the pretrial identification procedures were not unnecessarily suggestive. While the first prong of *Neil* focused on the procedure that law enforcement used to obtain the identifications, appellant's argument is that the arrays themselves were unnecessarily suggestive because her photos were distinct. Specifically, appellant argues that the background, the lack of "booking lines," the "drastically varied angle," and the relative size of her photos make them stand out within the arrays and render the arrays suggestive. We disagree.

{¶ 27} First, the photos in the arrays do not have identical characteristics. Though they were all taken at the Scioto County Jail, the photos vary by perspective angle, relative distance from the lens (size), and background color. Since these characteristics differ amongst the photos, the differences between

appellant's photos and the others do not draw unnecessary attention. Rather, the fact that appellant's photos differ from the others actually makes them similar to the others in the arrays.

{¶ 28} Second, appellant is correct that her photos lack the booking lines in the background, but this does not make the arrays suggestive. If anything, the lack of booking lines in appellant's photos would make her photo seem less incriminating, because they were devoid of any indication that they were taken inside a jail. Moreover, when considering the suggestiveness of the array itself, courts must consider the size of the array, the manner of its presentation, and its contents — whether the various persons are similar in age, features (including hair), skin tone, dress, and background.

{¶ 29} Regarding the size of the arrays, each consists of six photos, including appellant's. Appellant does not argue, nor do we find, that six photos are too few. Nor does appellant contend that the other women within the arrays are so different in age, features, skin tone, or dress as to render the arrays suggestive.

{¶ 30} Third, the manner in which law enforcement presented the arrays to A.S. and Damron was not suggestive. Detective Blaine initially showed the photo array to A.S. while he was on his mother's lap at the hospital. Once A.S.'s mother started to coax him, Blaine removed A.S. from his mother's lap and spoke to him privately, to specifically avoid any suggestiveness. Blaine asked A.S. whether he

could identify the woman who shot his family, and A.S. identified appellant's photo. That procedure was not suggestive.

{¶ 31} Likewise, Detective Blaine and Captain Hall's presentation of the array to Damron was not suggestive. Hall asked whether Damron had watched the news on television or had seen photos regarding the murders, but Damron assured him that he had not. Blaine handed the array to Damron and asked whether the woman he had seen driving the vehicle the night of the murders was within the array. Damron immediately identified appellant and was quite certain of his identification. Nothing in this procedure was unnecessarily suggestive, either.

{¶ 32} Thus, we find that the pretrial identification procedures were not unnecessarily suggestive. Therefore, any issues concerning their reliability go to their weight, not their admissibility, and we overrule appellant's first assignment of error.

## II. Change of Venue

{¶ 33} In her second assignment of error, appellant argues that the trial court erred by denying her motion for change of venue. Specifically, appellant contends that the extensive pretrial publicity concerning her case influenced the citizens of Scioto County and made it impossible for her to receive a fair trial. We disagree.

A. Standard of Review

{¶ 34} Our standard of review for denial of a motion to change venue is abuse of discretion. *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, at ¶ 23; *State v. Fairbanks* (1972), 32 Ohio St.2d 34, 37, 289 N.E.2d 352; *State v. Berecz*, 4th Dist. No. 08CA48, 2010-Ohio-285, at ¶ 30. An appellate court should reverse a trial court's decision regarding change of venue only upon a clear showing of abuse of discretion. *State v. Metz* (Apr. 21, 1998), 4th Dist. No. 96CA48, 1998 WL 199944, citing *State v. Gumm* (1995), 73 Ohio St.3d 413, 430, 653 N.E.2d 253. " 'The term "abuse of discretion" connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable.' " *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140, quoting *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 404 N.E.2d 144. "Under this highly deferential standard of review, we may not simply substitute our judgment for that of the trial court." *Woody,* 4th Dist. No. 09CA34, 2010-Ohio-6049, at ¶ 35, citing *In re Jane Doe 1* (1991), 57 Ohio St.3d 135, 137-138, 566 N.E.2d 1181. "Rather, we are limited to determining whether considering the totality of the circumstances, the trial court acted unreasonably, arbitrarily or unconscionably." Id., citing *Briganti v. Briganti* (1984), 9 Ohio St.3d 220, 222, 459 N.E.2d 896, citing *Blakemore* at 218-220.

**{¶ 35}** However, an appellant's failure to exhaust his peremptory challenges waives his ability to later challenge the denial of his motion for change of venue. *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, at ¶ 61. As the Supreme Court stated in *State v. Conway*, "[t]he limited number of defense challenges for pretrial publicity and the failure to exhaust peremptory challenges indicate that the defense did not believe that the jury venire was overly exposed to negative publicity." *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, at ¶ 38 (defense challenged only four of 14 venire members who indicated that they had heard about the case through media or had learned of the defendant's criminal past), citing *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, at ¶ 37. Here, because appellant did not exercise all her peremptory challenges, we review her second assignment of error only for plain error. *State v. Beebe*, 4th Dist. No. 10CA2, 2011-Ohio-681, at ¶ 15, citing *State v. McDougald*, 4th Dist. No. 07CA3157, 2008-Ohio-1398, at ¶ 16; *State v. Tackett*, 4th Dist. No. 06CA3103, 2007-Ohio-6620, at ¶ 28.

**{¶ 36}** "[T]here are 'three limitations on a reviewing court's decision to correct [a waived error]. First, there must be an error, *i.e.,* a deviation from a legal rule. * * * Second, the error must be plain. To be "plain" within the meaning of Crim.R. 52(B), an error must be an "obvious" defect in the trial proceedings. * * * Third, the error must have affected "substantial rights." [The Supreme Court of

Ohio has] interpreted this aspect of the rule to mean that the trial court's error must have affected the outcome of the trial.' " *State v. Lynn*, 129 Ohio St.3d 146, 2011-Ohio-2722, at ¶ 13, quoting *State v. Barnes* (2002), 94 Ohio St.3d 21, 27, 759 N.E.2d 1240.  Regarding the third limitation, "reversal is warranted only when the outcome of the trial clearly would have been different without the error."  *Beebe* at ¶ 10, citing *State v. Long* (1978), 53 Ohio St.2d 91, 372 N.E.2d 804, at paragraph two of the syllabus.

{¶ 37} Yet "[e]ven when all three prongs are satisfied, a court still has discretion whether or not to correct the error."  *Lynn* at ¶ 14, citing *State v. Noling,* 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, at ¶ 62.  Courts are "to notice plain error ' "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." ' " Id. at ¶ 14, quoting *Barnes* at 27, quoting *Long* at paragraph three of the syllabus.

B. Legal Analysis

{¶ 38} "The Sixth Amendment in terms guarantees 'trial, by an impartial jury * * *' in federal criminal prosecutions.  Because 'trial by jury in criminal cases is fundamental to the American scheme of justice,' the Due Process Clause of the Fourteenth Amendment guarantees the same right in state criminal prosecutions."  *Nebraska Press Assn. v. Stuart* (1976), 427 U.S. 539, 551, 96 S.Ct. 2791, 49 L.Ed.2d 683, quoting *Duncan v. Louisiana* (1968), 391 U.S. 145, 149, 88

S.Ct. 1444, 20 L.Ed.2d 491. "In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors * * *. 'A fair trial in a fair tribunal is a basic requirement of due process.' " *Nebraska Press Assn.* at 551, quoting *In re Murchison* (1955), 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942. "In the ultimate analysis, only the jury can strip a man of his liberty or his life." Id.

{¶ 39} Crim.R. 18(B) provides, "Upon the motion of any party or upon its own motion the court may transfer an action * * * when it appears that a fair and impartial trial cannot be held in the court in which the action is pending." R.C. 2901.12(K) provides the same.

{¶ 40} "Pretrial publicity can undermine a trial's fairness." *State v. Landrum* (1990), 53 Ohio St.3d 107, 117, 559 N.E.2d 710. "However, Crim.R. 18(B) does not require a change of venue merely because of extensive pretrial publicity." *Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, at ¶ 23. "[P]retrial publicity[,] even pervasive, adverse publicity[,] does not inevitably lead to an unfair trial." *Nebraska Press Assn.*, 427 U.S. at 554, 96 S.Ct. 2791, 49 L.Ed.2d 683.

{¶ 41} "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd* (1961), 366 U.S. 717, 723, 81 S.Ct. 1639, 6 L.Ed.2d 751, citing *Spies v. Illinois*

(1887), 123 U.S. 131, 8 S.Ct. 22, 31 L.Ed. 80; *Holt v. United States* (1910), 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021; and *Reynolds v. United States* (1878), 98 U.S. 145, 25 L.Ed. 244. " '[A] careful and searching *voir dire* provides the best test of whether prejudicial pretrial publicity has prevented obtaining a fair and impartial jury from the locality.' " *Landrum* at 117, quoting *State v. Bayless* (1976), 48 Ohio St.2d 73, 98, 357 N.E.2d 1035. "[E]ven extensive pretrial publicity may have dissipated its effects before trial." Id., citing *Murphy v. Florida* (1975), 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589.

{¶ 42} Thus, "[a] defendant claiming that pretrial publicity has denied him a fair trial must show that one or more jurors were actually biased." *Lynch* at ¶ 35, citing *State v. Treesh* (2001), 90 Ohio St.3d 460, 464, 739 N.E.2d 749. "Only in rare cases may prejudice be presumed." Id., citing *State v. Lundgren* (1995), 73 Ohio St.3d 474, 479, 653 N.E.2d 304, and *Nebraska Press Assn.*, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683.

{¶ 43} In *Irvin*, the Supreme Court reversed the defendant's conviction because of pretrial publicity and preformed opinions the jury venire possessed. *Irvin*, 366 U.S. at 727-729. The trial court excused 268 of 430 veniremen for having preformed opinions as to the defendant's guilt. Id. at 727. Even eight of the 12 seated jurors believed the defendant was guilty, but agreed to set aside their opinion and hear the evidence. Id. Despite the jurors' statements under oath that

they would remain fair and impartial, the Supreme Court found such an assertion dubious in light of the strong public sentiment: "The influence that lurks in an opinion once formed is so persistent that it unconsciously fights detachment from the mental processes of the average man."  Id.

{¶ 44} Likewise, in *Rideau v. Louisiana* (1963), 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663, the court reversed a defendant's conviction when the media had broadcast a televised "interview" between the sheriff and the defendant, in which the defendant confessed to the crimes with which he was charged.  The trial court had denied the motion for change of venue, but the Supreme Court, in a rather brief opinion, "[did] not hesitate to hold, without pausing to examine a particularized transcript of the voir dire examination of the members of the jury, that due process of law in this case required a trial before a jury drawn from a community of people who had not seen and heard Rideau's televised 'interview.' " *Rideau* at 727.

{¶ 45} Conversely, in a case when virtually all the veniremen had been exposed to pretrial media reports regarding the case, the Supreme Court of Ohio affirmed the denial of change of venue when no one in the venire could recall details of the media accounts, they all indicated that the pretrial media would not influence their opinion, and five months had passed between the initial proliferation of media accounts and the trial.  *Landrum,* 53 Ohio St.3d at 117, 559

N.E.2d 710. See also *Lynch,* 98 Ohio St.3d 514, 2003-Ohio-2284, at ¶ 33-38 (affirming the denial of change of venue when few veniremen recalled details of the case from the media, none expressed a preformed opinion of the defendant's guilt, and the defendant did not challenge any venireman for cause due to pretrial publicity).

{¶ 46} Here, the news reports were not inflammatory. The articles relayed only factual information. While there were comments posted on some of the news publications' websites, they do not factor into our analysis. The anonymity of the Internet precludes a finding that such comments showed that appellant could not receive a fair trial in Scioto County. There is no way of knowing whether any of the persons who posted comments actually resided in Scioto County. Nor is there a way of knowing whether each comment was posted by a unique person. Thus, anonymous comments posted on a website can hardly be used as an accurate gauge of the public sentiment for an entire county.

{¶ 47} Unlike the situation in *Rideau,* there was no "spectacle" within the media accounts. There was nothing that permits us to find that the process was presumptively prejudicial to appellant. Thus, we look to whether any of the jurors were actually biased.

{¶ 48} The initial voir dire revealed that the majority of the veniremen who did recall media accounts about the case were unable to recall specific details.

This is an excellent example of the effects of pretrial publicity dissipating before trial. It had been nearly 18 months between the incident and the trial. If the media had inflamed the community near the time of the murders, 18 months served well to squelch such sentiment. Indeed, only seven persons were dismissed from the entire venire because they had seen some form of pretrial media and were unable to set aside a preformed opinion of appellant's guilt. Furthermore, unlike the situation in *Irvin*, no one who was seated upon the jury had expressed a preformed opinion of appellant's guilt. Therefore, we find that none of the jurors were actually biased and that pretrial publicity did not deprive appellant of a fair trial.

{¶ 49} Without circumstances demonstrating that the community was presumptively prejudiced against appellant, and without demonstrating actual bias amongst the jurors, appellant's argument falls short, and we find that the trial court did not abuse its discretion when it denied appellant's motion to change venue. With no actual error and no demonstration of prejudice, we find no plain error. Accordingly, we overrule appellant's second assignment of error.

### III. Voir Dire

{¶ 50} In her third assignment of error, appellant argues that the trial court denied her due process and a fair trial because it did not question Clausing about whether her relationship to the Scioto County Sheriff would impede her ability to be fair and impartial. We find appellant's argument unpersuasive.

## A. Standard of Review

{¶ 51} By appellant's failing to inquire about Clausing's impartiality and failing to object to her being seated on the jury, appellant waived all but plain error.[1]

## B. Legal Analysis

{¶ 52} During the initial voir dire, when the court and counsel spoke with the veniremen individually, the trial court raised the issue of Clausing's relationship with the Scioto County Sheriff. The court inquired how close Clausing's relationship was with the sheriff, and she responded that they did not see each other very often, save the occasional family gathering for Christmas. This seemed to satisfy the court that Clausing's relationship with the sheriff would not influence her, as the court proceeded to discuss her view of the death penalty.

{¶ 53} Appellant contends, "The failure to question [Clausing] about that relationship prejudiced [appellant], because [Clausing] was seated as a juror and became the jury forewoman." The flaw in appellant's argument is that she has failed to demonstrate how the outcome of her trial would have been different had the trial court inquired further. The mere fact that Clausing was ultimately placed on the jury does not establish prejudice. Appellant has provided no evidence that

---

[1] See plain-error standard of review, supra.

Clausing was biased or prejudiced against her or that her presence on the jury affected the trial's outcome.

{¶ 54} To the contrary, Clausing disclosed that she had served as an alternate juror on a capital case once before and appreciated how emotional and serious a task it was. Her view on the death penalty had "mellowed," and she felt that "the [accused] has the right to a fair trial and to be heard, and for a decision to be made based on fairness."

{¶ 55} With no showing that Clausing's presence on the jury affected the trial's outcome, we find no plain error and overrule appellant's third assignment of error.

## IV. Ineffective Assistance of Counsel

{¶ 56} In her fourth assignment of error, appellant argues that her trial counsel failed to question Clausing on her relationship with the county sheriff and failed to object to her sitting on the jury, which amounted to ineffective assistance of counsel. We disagree.

## A. Standard of Review

{¶ 57} "In order to establish ineffective assistance of counsel, an appellant must show that counsel's representation was both deficient and prejudicial." *State v. Michael*, 4th Dist. No. 09CA887, 2010-Ohio-5296, at ¶ 15, citing *In re Sturm,* 4th Dist. No. 05CA35, 2006-Ohio-7101, at ¶ 77; *Strickland v. Washington* (1984),

466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. "Deficient representation means counsel's performance was below an objective standard of reasonableness. To show prejudice, an appellant must show it is reasonably probable that, except for the errors of his counsel, the proceeding's outcome would have been different." (Citations omitted.) *Michael* at ¶ 15. " 'Failure to satisfy either prong is fatal as the accused's burden requires proof of both elements.' " *State v. Weddington*, 4th Dist. No. 10CA19, 2011-Ohio-1017, at ¶ 12, quoting *State v. Hall,* 4th Dist. No. 07CA837, 2007-Ohio-6091, at ¶ 11, citing *State v. Drummond,* 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, at ¶ 205.

{¶ 58} We " 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.' " *State v. Hankison*, 4th Dist. No. 09CA3326, 2010-Ohio-4617, at ¶ 105, quoting *Strickland* at 689. " 'Moreover, the strategic decision of a trial attorney will not form the basis of a claim of ineffective assistance of counsel, even if there may have been a better strategy available.' " *Hankison* at ¶ 105, quoting *State v. Komora* (Apr. 4, 1997), 11th Dist. No. 96-G-1994, 1997 WL 184758, citing *State v. Clayton* (1980), 62 Ohio St.2d 45, 49, 402 N.E.2d 1189.

B. Legal Analysis

{¶ 59} " 'The conduct of voir dire by defense counsel does not have to take a particular form, nor do specific questions have to be asked.' " *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, at ¶ 61, quoting *State v. Evans* (1992), 63 Ohio St.3d 231, 247, 586 N.E.2d 1042. " '[C]ounsel is in the best position to determine whether any potential juror should be questioned and to what extent.' " *Davis* at ¶ 61, quoting *State v. Murphy* (2001), 91 Ohio St.3d 516, 539, 747 N.E.2d 765.

{¶ 60} Here, appellant's claim fails for two reasons. First, her counsel was vested with the discretion to decide what questions to ask the jury venire. Because appellant's counsel had no obligation to ask particular questions, it follows that there was no error when her counsel exercised its strategic discretion and did not ask particular questions of Clausing.

{¶ 61} Second, as with appellant's third assignment of error, she has failed to demonstrate prejudice. Appellant concedes, "Because defense counsel did not question Ms. Clausing about her relationship with the county sheriff during voir dire, there is no way to know to what extent that relationship affected Ms. Clausing's deliberations." That is, there is simply no way to know whether Clausing's presence on the jury prejudiced appellant. Consequently, appellant cannot demonstrate that the outcome of her trial would have been different if her

trial counsel had posed additional questions to Clausing or objected to her being on the jury.

{¶ 62} Without demonstrating an actual error or prejudice, appellant's claim of ineffective assistance of counsel fails.  Accordingly, we overrule appellant's fourth assignment of error.

Judgment affirmed.

HARSHA, P.J., and KLINE, J., concur.

_____