[Cite as *State v. Groves*, 2022-Ohio-442.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
SCIOTO COUNTY

STATE OF OHIO,                          :

    Plaintiff-Appellee,              : CASE NO. 20CA3902

    v.                               :

DANIEL A. GROVES, SR.,                  : DECISION AND JUDGMENT ENTRY

    Defendant-Appellant.             :

_____

APPEARANCES:

Richard E. Wolfson, Portsmouth, Ohio for appellant.[1]

Shane A. Tieman, Scioto County Prosecuting Attorney, and Jay S. Willis, Assistant Scioto County Prosecuting Attorney, Portsmouth, Ohio, for appellee.

CRIMINAL APPEAL FROM COMMON PLEAS COURT
DATE JOURNALIZED:2-8-22
ABELE, J.

{¶1}  This is an appeal from a Scioto County Common Pleas Court judgment of conviction and sentence.  A jury found Daniel Groves, Sr., defendant below and appellant herein, guilty of: (1) murder, (2) kidnapping, (3) child endangerment, (4) tampering with evidence, (5) interference with custody, (6) gross abuse of a corpse, and (7) four counts of second-degree felonious assault.

{¶2}  Appellant raises the following assignments of error for

_____

    [1]  Different counsel represented appellant during the trial

review:

FIRST ASSIGNMENT OF ERROR:

"APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF
COUNSEL UNDER THE FIFTH, SIXTH, AND FOURTEENTH
AMENDMENTS TO THE UNITED STATES CONSTITUTION
AND ARTICLE I, SECTION 10 OF THE OHIO
CONSTITUTION DEPRIVING HIM OF A FAIR TRIAL, THE
OUTCOME OF WHICH WOULD HAVE BEEN DIFFERENT BUT
FOR TRIAL COUNSEL'S CUMULATIVE DEFICIENCIES AND
THE PREJUDICE CAUSED."

SECOND ASSIGNMENT OF ERROR:

"THE TRIAL COURT COMMITTED PLAIN ERROR BY
FAILING TO PROVIDE THE JURY THE CAUTIONARY
INSTRUCTION AT R.C. 2923.03(D) THAT HAD IT BEEN
GIVEN, WOULD HAVE RESULTED IN A DIFFERENT
OUTCOME."

{¶3} On June 14, 2019, a Scioto County Grand Jury returned an

indictment that charged appellant with multiple, serious felony

offenses.[2]

---

court proceedings.

[2] The Scioto County Grand Jury returned an indictment that
charged appellant with the following eleven counts:  Count 1 -
aggravated murder, in violation of R.C. 2903.01(C), an unspecified
felony; Count 2 - murder, in violation of R.C. 2903.02(B), an
unspecified felony; Count 3 - kidnapping, in violation of R.C.
2905.01(A)(5), a first-degree felony; Count 4 - endangering
children, in violation of R.C. 2919.22(A), a third-degree felony;
Count 5 - tampering with evidence, in violation of R.C.
2921.12(A)(1), a third-degree felony; Count 6 - interference with
custody, in violation of R.C. 2919.23(A)(1), a fourth-degree
felony; Count 7 - gross abuse of a corpse, in violation of R.C.
2927.01(B), a fifth-degree felony; Count 8 - felonious assault, in
violation of R.C. 2903.11(A)(1), a second-degree felony; Count 9 -
felonious assault, in violation of R.C. 2903.11(A)(1), a second-
degree felony; Count 10 - felonious assault, in violation of R.C.

On June 17, 2019, appellant pleaded not guilty to the charges set forth in the indictment. Jessica Groves (appellant's spouse, co-defendant and victim Dylan Groves' birth mother) initially pleaded not guilty by reason of insanity, but after the trial court found her competent, she pleaded not guilty on September 24, 2019.

{¶4} On January 6, 2020, a five-day joint jury trial began with both co-defendants present. Registered Nurse Darienne Liles worked at Southern Ohio Medical Center (SOMC) on January 10, 2019 when appellant and Jessica Groves (hereinafter Groves) arrived at the hospital at 5:25 a.m. Liles testified that Groves appeared to be "flat, disconnected and uncooperative," refused to provide a urine sample, and refused to answer questions about prenatal care. Groves was completely dilated, but "not in pain, * * * very unusual for somebody who we've not administered pain medicine to." Moments before the baby's birth, appellant stated that Groves "had used heroin two days ago."

{¶5} SOMC staff eventually obtained Groves' urine sample that tested positive for amphetamines. Approximately 30 minutes after Groves entered the hospital, she delivered Baby Dylan (Dylan).

---

2903.11(A)(1), a second-degree felony; and Count 11 - felonious assault, in violation of R.C. 2903.11(A)(1), a second-degree felony.

Nurse Liles testified that appellant "seemed worried and almost afraid." "Whenever we were questioning her they were both just making * * * eye contact with each other, not acting like they were paying much attention to us." "The only thing [appellant] said was that she [Groves] had used heroin that she was always too high to go to her prenatal care visits." * * * "[W]e thought he was almost looking to [Groves] for permission to answer our questions. I could feel a couple of times he wanted to say things or answer and he did not." Liles testified that neither Groves nor appellant requested to see Dylan after his birth.

{¶6} Registered Nurse Tori Howell cares for newborns in the SOMC nursery. Howell testified that because Dylan, born approximately one month early, had difficulty breathing, they removed him to the nursery. Howell also testified that (1) Dylan's preliminary screen showed "unconfirmed positive" for amphetamines, and (2) the umbilical cord tested positive for amphetamines, methamphetamines, fentanyl, opiates, and morphine. Also, while Dylan was in the nursery for several days, appellant visited once and neither parent asked about Dylan's condition.

{¶7} SOMC Obstetrician-Gynecologist Dr. Darren Adams was on call when Groves and appellant arrived at the hospital. The hospital called Dr. Adams because Groves had no prenatal care and was ready to deliver. When Dr. Adams arrived, Groves, dilated at

nine and one half centimeters, appeared distant and did not answer questions.  Dr. Adams believed Groves might have been impaired because, typically, a mother that far dilated with no pain medication would be in extreme pain, but "she was just distant, an - - an odd reaction."  Dr. Adams delivered Dylan within minutes and he weighed 5 pounds, 10 ounces, and was 19 inches long.  Later that day, Dr. Adams returned to care for Groves' postpartum hemorrhage.

{¶8}   Assistant Nurse Manager Stacey Riffitt testified that Jessica Groves kept Dylan for 15 minutes after his birth and "didn't hold him.  She didn't ask how his condition was.  She just said, 'Put him there on the wall.'"   Also, Dylan was diagnosed with neonatal abstinence syndrome, meaning that he had been exposed to drugs in utero and was in withdrawal.  Dylan had tremors, could not quiet himself, and needed to be comforted.  Riffitt explained that an umbilical cord test shows "every substance the mother used from 20 weeks gestation on."  Riffitt also testified that Dylan required oxygen treatment immediately after birth, but they weaned him from the oxygen treatment within 90 minutes and otherwise he appeared to be "very healthy" with no injuries.

{¶9}   When Nurse Riffitt spoke with appellant in Groves' hospital room, appellant told Riffitt that he had "just talked with the physician and asked if meth could be found in heroin." Appellant also told Riffitt that Groves, a nurse, used heroin and,

after she learned of her pregnancy, she continued to use heroin, "enough to keep the withdrawal symptoms from happening to her." Riffitt later returned to the room and appellant's eyes "looked a little more glassy.  He would not make eye contact with me.  His speech was slow."  Riffitt believed appellant was under the influence of something.  Riffitt further testified that, after Dylan stayed at the hospital for five days to monitor drug withdrawal symptoms, the hospital discharged Dylan to Scioto County Children's Services (SCCS).

{¶10}  SOMC Social Worker Christine Procter Frantz testified that Dylan's initial discharge plan permitted him to go home with appellant due to appellant's negative drug screen, and because appellant told SCCS he did not know about Groves' drug use during pregnancy.  Frantz also stated that, although SCCS considered the unconfirmed positive not to be a true positive, the hospital disagreed and sought to keep Dylan until they received the umbilical cord test results "because with mom and baby both being positive it should be an automatic removal."

{¶11}  SOMC Social Work Services Manager Mandy Burchett testified that the hospital received the cord toxicology results on January 15, 2019 and learned that Dylan would be discharged to foster care.

{¶12} On January 16, 2019, SCCS filed a complaint in the juvenile court and alleged Dylan (age six days), and appellant's other child, Daniel, Jr. (age 14), to be abused, neglected and dependent. SCCS sought an ex parte order to place Dylan in SCCS custody and Daniel, Jr. under an order of protective supervision.

{¶13} On January 16, 2019, the juvenile court awarded Dylan's custody to SCCS and on January 28, 2019, the court further ordered: (1) the children remain in SCCS custody, (2) Groves complete a drug abuse evaluation and follow all recommendations, and (3) Groves report to juvenile court and complete an assessment to participate in the Family Reunification Court.

{¶14} After foster parent and elementary school teacher Andrea Bowling received a call to ask her to foster parent a drug-dependent infant, she took physical custody of Dylan. Bowling observed Dylan's tremors, sweats and his desire to be held at all times. Also, during visitation with Dylan's parents at SCCS, Bowling believed a "possibility that Groves may have been under the influence of something." When Dylan reunited with his parents on January 28, 2019, Bowling gave appellant diapers, supplies, and a letter with Bowling's contact information and statement that she would be available if the parents needed anything. After the family visitation, Bowling also called SCCS about her concerns with Groves' demeanor.

{¶15}  Scioto County Help Me Grow Service Coordinator Stephanie Jenkins administers an Early Intervention Program.  In this program, staff will (1) conduct home visits to screen and monitor a child's progress, (2) assist parents to understand developmental milestones, and (3) work directly with children, and (4) refer a family to other programs, including WIC, Head Start, medical cards, food stamps, therapies and transportation.  After Jenkins received a January 25, 2019 referral, she made multiple attempts, from January to March, to contact Dylan's parents.  However, on March 11, 2019 Help Me Grow terminated the parents from the program because of their lack of a response.

{¶16}  SCCS Caseworker Patricia Craft, who served as Dylan's caseworker, testified that, after Dylan's removal from Groves' custody and the juvenile court's emergency order that awarded custody to SCCS, foster parent Andrea Bowling took physical custody of Dylan.  A safety plan identified Groves' substance abuse as a threat, and required her to (1) sign a release form, (2) obtain a drug and alcohol assessment, (3) submit to weekly contact and drug treatment, (4) remain outside the home unless supervised, and (5) submit to supervised visits.

{¶17}  Caseworker Craft testified that she first met Dylan's parents on January 25, 2019 at a family team meeting.  Participants at the meeting included Caseworker Johnson, Andrea Bowling, Groves

and appellant.  At that time, Daniel, Jr. remained in appellant's custody.  Appellant also informed Craft that he had a six-month leave from his employment at Rural King.  SCCS informed both parents that they should complete drug and alcohol assessments, participate in individual counseling, and comply with court orders.  Immediately after the team meeting, the parents had a one-hour visit with Dylan.  Afterward, Bowling told Craft that she thought Groves was "loopy" and "on drugs."

{¶18}  Caseworker Craft further explained that, because appellant had no violent criminal history and no prior SCCS involvement, SCCS policy provided that Dylan should be returned to appellant if he could successfully pass another drug screen.  Interestingly, although appellant's drug screen tested clean, neither Craft nor anyone else directly observed appellant during the drug screen process.

{¶19}  SCCS returned Dylan to appellant on January 28, 2019.  At the February 4, 2019 home visit, Caseworker Craft observed that Dylan appeared to be quiet and exhibited no visible injuries.  Additionally, Jessica Groves was in treatment and SCCS required her to attend treatment "until further notice" and to continue to report to drug court.

{¶20}  Between February 4 and 21, 2019, Caseworker Craft made multiple phone attempts to contact appellant.  Craft and another

caseworker visited appellant's home, but found no one. Craft then visited Daniel, Jr.'s school and gave him a note to ask appellant to call Craft. Craft also left notes in appellant's door and mailbox and, on February 21, 2019, visited appellant's residence. During this attempted visit, Craft observed Daniel, Jr. exit his school bus and enter the home. Craft also noticed two dogs and a chain with a "No Trespassing" sign, but did not see cars. The next day, Craft returned to appellant's home, but did not see cars.

{¶21} On February 25, 2019, Caseworker Craft completed her monthly home visit and observed that Dylan appeared to be clean, appropriately dressed, and displayed no visible injuries. According to appellant, Dylan had recently visited the doctor, weighed 8 pounds, 9 ounces, and was 22 inches long. Appellant also told Craft that Jessica Groves stayed at the residence only during the day, but Craft could not verify this information.

{¶22} At the time of the next monthly scheduled home visit on March 18, 2019, appellant told Caseworker Craft that he was in Canton visiting his ill father. At the rescheduled March 21, 2019 visit, Craft found no one home. After she returned to her office, Craft received appellant's voicemail that said he was in Canton with his father.

{¶23} At the March 27, 2019 juvenile court hearing, Groves appeared at the hearing, but appellant did not. The juvenile court

adjudicated the children to be abused, neglected and dependent, pointed out that Groves did not complete her drug treatment program, and concluded that Dylan's best interests required him to remain in SCCS custody pending disposition.

{¶24} At the March 28, 2019 home visit, Caseworker Craft interacted with appellant, Groves and Dylan. Although Craft did not inquire why appellant did not attend the March 27, 2019 adjudication, she did observe Groves feed Dylan. Also, Craft did not observe any injuries to Dylan. When both parents told Craft they had kept all appointments and asked Craft whether Groves could return home, Craft said she would ask her supervisor. Craft also reminded them about the April 3, 2019 court hearing and her next monthly home visit on April 9, 2019.

{¶25} On April 3, 2019, appellant texted Caseworker Craft and said that, although he and Groves had been ill, they drove to Canton to visit appellant's father when their car broke down and they became stranded. On April 17, 2019, Craft unsuccessfully attempted to inform appellant that the guardian ad litem wanted to visit their home and Craft's next home visit would be April 24, 2019. At this point, because appellant had texted Craft from four different numbers, she and the guardian ad litem attempted to contact appellant using all four numbers. Further, Craft learned that, since February 8, 2019, Groves had not complied with her

individual therapy visits and she last attended a group session on March 26, 2019.

{¶26} At the April 18, 2019 juvenile court hearing, appellant's attorney, Groves' attorney, Caseworker Craft, and the SCCS attorney all attended, but appellant and Groves did not. At the conclusion of the hearing, the juvenile court ordered Dylan to remain with SCCS.

{¶27} On April 19, 2019, Caseworker Craft again visited appellant's home, knocked on the door for several minutes, then left cards in the door and mailbox to ask appellant to call. Craft also contacted Rural King because she thought appellant could be at work, but Rural King informed her that appellant quit his job in 2018. That same day, appellant texted Craft and said he was still "up north" and a friend watches his home when he is away. Appellant also told Craft that Dylan is "doing great. Growing like a weed. LOL." Because of car trouble, appellant said his uncle could bring him home Monday or Tuesday and he would contact Craft.

{¶28} Caseworker Craft continued to attempt to contact Dylan's parents on April 19, 22, 23, and 24, 2019. Craft also visited school to talk with Daniel, Jr., who appeared to be nervous, but told her that Dylan was fine. When Craft asked if Groves stayed at their home, first Daniel, Jr. said, "yes," then he said "occasionally." When asked about his ill grandfather in Canton,

Daniel, Jr. replied "Who was that?"

{¶29}  On April 24, 2019, SCCS took custody of Daniel, Jr. and placed him with an aunt and uncle.  Shortly thereafter, Caseworker Craft received appellant's text that asked why Daniel, Jr. did not come home from school.  Craft then visited appellant's home, and because of the parked cars, assumed everyone to be home, but received no answer.  Craft then texted appellant and told him to bring Dylan, along with the children's personal items, to the agency the next day.  Appellant said he would do so, but did not. On April 25, 2019, the juvenile court continued protective supervision of Daniel, Jr., and continued Dylan's temporary custody with SCCS.

{¶30}  On April 30, 2019, Caseworker Craft filed a missing person report with the Scioto County Sheriff's Department.  Craft continued to communicate with appellant and, on May 3, 2019, visited the residence, along with another caseworker and a deputy sheriff.  On May 7, 2019, Craft returned to the residence and observed all vehicles present.  On May 15, 2019, SCCS visited the residence and noted one missing vehicle.  On May 23, 31, and June 7, 2019, SCCS attempted additional home visits, but to no avail. Craft testified that other agencies, including the juvenile court and Care Source, searched for appellant.

{¶31} On June 10, 2019, Caseworker Craft learned that law enforcement had arrested both appellant and Groves and "Jessica and Daniel was [sic.] telling them that I came several months ago and took the child." Craft, however, testified that she last observed Dylan on March 28, 2019. Craft also conceded on cross-examination that SCCS did not issue an Amber Alert because a supervisor believed that, if an Amber Alert goes out, it "would give a bad reputation for the agency because we lost a child."

{¶32} Pediatrician Dr. Mohammad Ali first observed Dylan at the hospital soon after his birth, then a few times at his office. Dr. Ali testified that Dylan stayed at the hospital longer than normal due to drug withdrawal symptoms. On January 16, 2019, Dr. Ali observed Dylan in his office for a well-newborn check and Dylan's foster parent stated that he sneezed, perspired excessively, had tremors, but otherwise appeared to be well. Dr. Ali learned about the abnormal newborn 17-hydroxy progesterone screening, that indicated elevated risk for congenital adrenal hyperplasia, but Dylan's care transferred to a different pediatric practice and miscommunication occurred about whether the screening had been repeated. Dr. Ali also testified that, although he did not know whether the screening had been repeated, this abnormality would not cause bone fractures, bruising or swelling of the head.

{¶33} Christ Care Pediatrics Pediatrician Dr. Gregory Hudson testified he first observed Dylan on February 7, 2019. Dr. Hudson discussed the abnormal 17-hydroxy progesterone screening and ordered additional lab work to recheck the abnormal panel. As instructed, Groves and appellant returned to Dr. Hudson's office on February 21, 2019 when Dr. Hudson learned that Groves had completed all but one lab test. Because Dr. Hudson was not the attending pediatrician at Dylan's birth, and he did not know that the hospital had completed a 17-hydroxy progesterone test, Dr. Hudson ordered another test. Although Dylan exhibited no injuries at his February 21, 2019 office visit, he did weigh on the low end of normal. Consequently, Dr. Hudson scheduled a March 7, 2019 return visit. Groves, however, did not return with Dylan.

{¶34} Dr. Hudson further explained that, due to the testing mix-up, his office sent two letters to Groves to indicate the importance of another test and threatened that, if they did not repeat the screening, "they will involve Children's Protective Services." In addition to the letters, his office called appellant and Groves, but received no response. Dr. Hudson further testified that in his 30 years of experience, he had never observed a two to three month old baby fracture his own skull, ribs, arms or legs.

{¶35} Mahajan Therapeutics Therapist Jessica Byrd testified that SCCS referred Jessica Groves to their facility for assessment and treatment. Groves completed her drug and mental health assessments on January 18, 2019, attended an individual therapy session on February 8, 2019, and submitted to several supervised drug screens. However, after February 8, 2019, Groves became "very inconsistent and eventually then just totally stopped coming." Byrd also contacted SCCS on February 14, 15, 22, 27, March 1, and April 2, 2019 about Groves' noncompliance. Apparently, Groves attended one group counseling session on March 26, 2019, but was "a little bit different. * * * she was very defensive. It seemed like she was edgy, a little angry, just upset that Children's Services like wasn't letting her husband just be with the baby." Byrd also suspected Groves was under the influence of drugs or alcohol at her March 26, 2019 session.

{¶36} Scioto County Juvenile Court Intake Officer and Investigator Greg Dunham testified that, after SCCS removed Dylan, the juvenile court ordered Jessica Groves to report to Dunham twice per month. Dunham met with Groves on January 24, 2019, reviewed her requirements and completed a drug court assessment. Groves, however, missed three report dates and did not appear until March 28, 2019 when she told Dunham that she missed appointments because

she had no transportation.  Dunham also visited the Groves

residence on May 31, June 3, June 4, June 5, and June 10, 2019, but

could not locate Groves.

{¶37}  Scioto County Sheriff's Captain John Murphy visited the

Groves home on May 20, 2019 and attempted to locate Dylan, but the

driveway had been "cabled off" with motion detectors.  Murphy did

hear dogs inside the mobile home, but did not see anyone.  When

Murphy began to leave, he spoke with a neighbor who told him "they

[the Groves] leave early morning hours and they come back late at

night.  They're usually on a four-wheeler riding up and down the

roadway."  During this conversation, Murphy observed Groves and

appellant riding atop a four-wheeler.  Murphy did attempt to stop

them, but appellant "took off through a field and I gave chase

through the grassy field, and they hit the woods and we could not

pursue any further."

{¶38}  Scioto County Sheriff's Detective Adam Giles testified he

secured a search warrant on June 10, 2019 and visited the Groves

home, along with other officers.  After officers surrounded the

home, they knocked on the door and asked the occupants to exit.

Approximately 15 to 20 minutes later, Groves exited, screamed,

cursed and informed officers that SCCS had already taken Dylan.

Groves, however, would not answer whether appellant remained inside

the home.  When appellant did not exit, officers sent a robot into the home.  Eventually, officers apprehended appellant and he told them he had "been asleep the whole time."  When Giles asked about Dylan, appellant said that SCCS had already taken him.

{¶39}  Otway Volunteer Fire Department firefighters Steven Gambill and Dan Shirey testified that the department used a truck and chain saws to access a logging road to search a well, but the water level prevented a search.  Instead, they dropped a hook into the well and retrieved two milk crates connected with a heavy padlocked chain.  Montgomery County Coroner's Office Forensic Pathologist Dr. Susan Brown received Dylan's body in two milk crates, connected with a chain and "three padlocks * * * 12 zip ties, and * * * eight metal wires * * * [and] 18 large rocks." Dylan had been "wrapped in multiple layers of plastic and around all of this plastic is this iron anchor type device."  Dr. Brown testified that Dylan's body exhibited: (1) skull fractures (that did not occur simultaneously), (2) bruises on right side of chest and left leg, (3) laceration on left arm, (4) fractures of the left humerus or the upper arm bone * * * and * * * fracture of the left radius and ulna, the bones of the left forearm, (5) fractures of left tibia, and (6) on sixth rib an "old healing fracture, and the same thing on rib seven next to it, a large nodular area, which is

a healing old fracture, left rib six and seven." The examination further revealed that the rib fractures did not occur at the same time as the other fractures. Dr. Brown testified that Dylan's "cause of death is homicidal violence of undetermined etiology." She explained Dylan had been a victim of blunt force trauma, but the "specific cause of death can't be determined because a typical exam could not be performed because his body was decomposing from being concealed in - - in water for months." Dr. Brown also believed the fractures showed at least three different traumas. At June 13, 2019 autopsy, Dylan weighed four pounds and eight ounces, when he had weighed 7 pounds and 15 ounces on February 21, 2019. Furthermore, toxicology reports detected methamphetamine and amphetamine in Dylan's liver.

{¶40} Scioto County Sheriff's Detective Jodi Conkel interviewed Groves after her arrest and described her as "very standoffish, cold, didn't really want to talk to me, kind of annoyed." Groves told Conkel that SCCS had taken Dylan and Daniel, Jr., and that she did not use illegal drugs. Later that day, Conkel interviewed appellant who also maintained that SCCS had taken Dylan. Conkel stated that appellant appeared to be "dope sick," which he did admit to Conkel. Appellant later told Conkel that he found Dylan in his crib deceased.

{¶41} On June 12, 2019, Detective Conkel interviewed Jessica Groves and appellant. During this conversation, appellant admitted that he knew that SCCS did not take Dylan. The Sheriff's Office also accommodated appellant's request to talk to Groves, and a video recording of their jail conversation revealed additional information:

> DEFENDANT D. GROVES: When they took me out there yesterday - - wanted me to take them where he was at, and I took them - - some bullshit place because - - don't tell them where he is because if they find his body - -
>
> DEFENDANT J. GROVES: (Inaudible).
>
> DEFENDANT D. GROVES: If they find his body and if they find out where he had a broken arm and shit, we're fucked. It don't matter.
>
> DEFENDANT J. GROVES: They don't know where he's at. I don't know where he's at.

At some point, appellant agreed to take authorities to Dylan's body. Detective Conkel also testified about a calendar found in the mobile home with a notation "Worse [sic.] day ever" on April 24, 2019, the date SCCS removed Daniel, Jr.

{¶42} Daniel, Jr., the co-defendants' 15-year old son, testified he first found out about his mother's pregnancy "somewhere around in November" 2018. Before Daniel, Jr.'s April 24, 2019 removal from the home, Daniel, Jr. observed bruising and swelling on Dylan's head and, when he asked his parents what

happened, appellant told him "about him getting a - - like a dream catcher stuck within his arm and him swinging a small tiny stone up to his head. I'm not sure if that caused the injury - - the swelling of his head. I don't believe it was." Daniel, Jr. also testified that every couple of months, he provided his urine to appellant, both before and after Dylan's birth, and appellant then put the urine in a capped lid bottle.

**{¶43}** At the close of the state's case-in-chief, the trial court conducted a lengthy and thorough discussion with the co-defendants. The court informed them about their right to testify or not to testify, and the consequences of either choice, including cross-examination about prior criminal offenses. After both co-defendants informed the court that they wished to testify, Groves testified as follows:

> Q [Jessica's Counsel Mr. Stratton]: Jessica, did you, and you only, cause the death of your son, Dylan Groves?
>
> A: Yes.
>
> Q: Did Daniel Groves participate in the killing of Dylan?
>
> A: No.
>
> Q: Was Daniel Groves aware of any of the injuries that you caused Dylan that may have led to his death?
>
> A: No.
>
> Q: Did you hide all the injuries that you caused Dylan from your husband?

A: Yes.

* * *

Q: Jessica Groves, the injuries that Dylan sustained happened on what date?

A: On March 27th.

Q: Dylan died on what date?

A: March 28th.

* * *

Q: Where did you take Dylan after he died?

A: He was at our house for a couple days.

Q: And then where did you take him?

A: To the well.

Q: Did you murder Dylan Groves?

A: Not intentionally.

{¶44} On cross-examination, the state asked Jessica Groves how she caused Dylan's death, to which she replied, "[i]t was an accident." When asked about the rib fractures, Groves replied "by dropping him." When asked about the skull fractures, she said "I don't remember. * * * It had to be from dropping him." When asked about the upper arm fracture, she replied "Nothing that I ever did was intentional. * * * I have to live with this for the rest of my life. * * * You have devoured my family." When pressed for

details about how she caused Dylan's death, she told the
prosecutor, "I've admitted to my guilt. * * * And I have to live
without - - my children. * * *  I'm done talking to you."  At that
point, the trial court admonished Groves that she must submit to
cross-examination, or her testimony would be stricken.  She then
responded to most questions "I don't remember."  Eventually, Groves
did state that she did not have a clear mind "because of drugs,"
and that appellant, her co-defendant, participated only in the
preparation and concealment of Dylan's body.

{¶45}  After appellant testified about his prior shoplifting
conviction, he addressed facts in the case at bar and stated that
Jessica Groves first told him about her pregnancy in October or
November 2019.  About five minutes into their trip to the hospital
for Dylan's birth, Groves also told appellant that "she had been
using drugs and that she had not went to her [prenatal]
appointments."  According to appellant, he hesitated to answer
medical questions at the hospital because he had not processed what
he had just learned, and that Groves could be "intimidating."
Appellant did say he visited Dylan once in the nursery and inquired
about his health.  Appellant also claimed he was not impaired at
the hospital, but he may have given that appearance because he had
"been up for over 30 some hours straight."  Additionally, appellant

testified that he provided his own urine sample at the hospital, but admitted that, on other occasions, he asked Daniel, Jr. for his urine, but always for a friend to use for drug tests. Appellant explained the reason he did not give his own urine to his friend is because he "smoked some marijuana and occasionally would hit - - smoke, you know a little." Thus, appellant claimed he did not use his son's urine sample to fake his own drug test.

{¶46} Appellant also testified that he recalled seeing bruises on Dylan's head, but did not see swelling. Appellant believed that Dylan's head bruise resulted from an accident with a dream catcher, and that the bruise appeared to be on Dylan's forehead, not all around his head. Appellant also testified he did not cause Dylan's death and was not present when Dylan died. Instead, appellant said he found Dylan deceased in his crib. Appellant also said that, after Groves told him SCCS would blame him for Dylan's death because he had custody, he became scared and lied to law enforcement. Appellant did admit, however, that he told Detective Conkel that he had "seen [sic] her [Groves] hit him probably four times, probably," * * * "because he wouldn't stop crying and because she was so * * * agitated and aggravated and if I brought her coke [cocaine] she wouldn't be that way." Appellant also admitted he told Conkel, "[o]ne time I saw her, she had a hold of

him like below his arms. * * * Like by his ribs or something and she just kind of went ahh." Appellant again said he did not tell the truth because he feared "he would get the blame for it completely."

{¶47} After hearing the evidence, the jury found appellant not guilty of aggravated murder, but guilty of: (1) murder, in violation of R.C. 2903.02(B), an unclassified felony, (2) kidnapping, in violation of R.C. 2905.01(A)(5), a first-degree felony, (3) child endangerment, in violation of R.C. 2919.22(A), a third-degree felony with a serious physical harm specification, (4) tampering with evidence, in violation of R.C. 2921.12(A)(1), a third-degree felony, (5) interference with custody, in violation of R.C. 2919.23(A)(1), a fourth-degree felony with a physical harm specification, (6) gross abuse of a corpse, in violation of R.C. 2927.01(B), a fifth-degree felony, and (7) four counts of felonious assault, in violation of R.C. 2903.11(A)(2), second-degree felonies.

{¶48} At that point, the trial court: (1) merged Count 2 murder and Count 11 felonious assault, (2) merged Count 3 kidnapping and Count 6 interference with custody, and (3) merged Count 8 felonious assault and Count 10 felonious assault.

{¶49}  For sentencing, the trial court imposed the following prison sentences: (1) 15 years to life for Count 2 murder, (2) 10 years for Count 3 kidnapping, (3) 36 months for Count 4 endangering children, (4) 36 months for Count 5 tampering with evidence, (5) 12 months for Count 7 gross abuse of a corpse, (6) eight years for Count 8 felonious assault, and (7) eight years for Count 9 felonious assault.  The court also ordered (1) the tampering and abuse of a corpse sentences to be served concurrently with each other, (2) the sentences in Counts 2, 3, 4, 6, 8, 9, 10, and 11 to be served consecutively, and (3) a mandatory five-year post-release control term.

{¶50}  Consequently, the trial court sentenced appellant to serve an aggregate prison term of 47 years to life.  This appeal followed.[3]

---

[3]  Co-defendant Jessica Groves' appellate case number is 20CA3904.  The jury found her guilty of: (1) aggravated murder in violation of R.C. 2903.01(C), an unclassified felony, (2) murder in violation of R.C. 2903.02(B), an unclassified felony, (3) kidnapping in violation of R.C. 2905.01(A)(5), a first-degree felony, (4) child endangerment in violation of R.C. 2919.22(A), a third-degree felony with a serious physical harm specification, (5) tampering with evidence in violation of R.C. 2921.12(A)(1), a third-degree felony, (6) interference with custody in violation of R.C. 2919.23(A)(1), a fourth-degree felony with a physical harm specification, (7) gross abuse of a corpse in violation of R.C. 2927.01(B), a fifth-degree felony, and (8) four counts of felonious assault in violation of R.C. 2903.11(A)(1), second-degree felonies.

I.

{¶51} In his first assignment of error, appellant asserts that
his trial counsel provided ineffective assistance of counsel under
the Fifth, Sixth, and Fourteenth Amendments to the United States
Constitution and Article I, Section 10 of the Ohio Constitution.

{¶52} In particular, appellant claims that, in light of trial
counsel's knowledge about the state's intention to prove
complicity, his counsel should not have relied on co-defendant
Jessica Groves and her counsel to provide testimony in their joint
trial to establish that she alone caused Dylan's death.  Appellant
contends these actions fell below an objective standard of
reasonable representation, violated essential duties, prejudiced

---

With respect to Jessica Groves, the trial court: (1) merged
Count 1 aggravated murder, Count 2 murder and Count 11 felonious
assault, (2) merged Count 3 kidnapping and Count 6 interference
with custody, and (3) merged Count 8 felonious assault and Count 10
felonious assault.
The trial court then imposed the following prison sentences
for Jessica Groves: (1) life without parole for Count 1 aggravated
murder, (2) ten years for Count 3 kidnapping, (3) 36 months for
Count 4 endangering children, (4) 36 months for Count 5 tampering
with evidence, (5) 12 months for Count 7 gross abuse of a corpse,
(6)  eight years for Count 8 felonious assault, and (7) eight years
for Count 9 felonious assault.  The court further ordered Counts 5
and 7 to be served concurrently, Count 1, 2, 3, 4, 6, 8, 9, 10, and
11 to be served consecutively, and a mandatory five-year post-
release control term.
Consequently, the trial court sentenced Jessica Groves,
appellant's co-defendant, to serve an aggregate prison term of life
without parole, plus an additional 32 years.

appellant and resulted in a reasonable probability that the trial's outcome would have been different had counsel pursued an independent defense.  Furthermore, appellant argues that trial counsel's cumulative failures, including the failure to file a written motion for a change of venue along with supporting evidence, the failure to request a separate trial, the failure to file a written motion for a separate sentencing hearing along with facts in mitigation, and the failure to attend his co-defendant's competency hearing and obtain a copy of the evaluation report, all caused him prejudice and denied him a fair trial.

### A.   Reliance on Co-defendant's Counsel and on the Co-defendant to Testify in Joint Trial

{¶53}  Appellant asserts that his trial counsel, knowing that the state intended to prove appellant's complicity, improperly relied on the strategy of a co-defendant and her counsel to testify in their joint trial that she alone caused Dylan's death. Appellant contends that these actions, or inactions, fell below an objective standard of reasonable representation, violated essential duties to the appellant, prejudiced him, and resulted in a reasonable probability that the outcome of his trial would have

been different had counsel pursued an independent defense.

{¶54}  The Sixth Amendment to the United States Constitution, and Article I, Section 10 of the Ohio Constitution, provide that defendants in all criminal proceedings shall have the assistance of counsel for their defense.  The United States Supreme Court has generally interpreted this provision to mean that a criminal defendant is entitled to the "reasonably effective assistance" of counsel.  *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

{¶55}  To establish an ineffective assistance of counsel claim, a defendant must show (1) counsel's deficient performance, and (2) the deficient performance prejudiced the defense and deprived the defendant of a fair trial.  *Id.* at 687.  To establish a deficient performance, a defendant must prove that counsel's performance fell below an objective level of reasonable representation.  *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 95.  Additionally, courts need not analyze both Strickland test prongs if a claim can be resolved under one prong.  *See State v. Madrigal*, 87 Ohio St.3d 378, 389, 721 N.E.2d 52 (2000); *State v. Clark*, 4th Dist. Pike No. 02CA684, 2003-Ohio-1707, ¶ 17; *State v. Blair*, 4th Dist. Athens No. 18CA24, 2019-Ohio-2768, ¶ 58; *State v. Bowling*, 4th Dist. Jackson No. 19CA2, 2020-Ohio-813, ¶ 12-13.

{¶56} When a court examines whether counsel's representation amounts to deficient performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland* at 689, 466 U.S. 668, 104 S.Ct. 2052. Moreover, because a properly licensed attorney is presumed to execute all duties ethically and competently*, State v. Taylor*, 4th Dist. Washington No. 07CA11, 2008-Ohio-482, ¶ 10, to establish ineffectiveness a defendant must demonstrate that counsel's errors were "so serious" that counsel failed to function "as the 'counsel' guaranteed * * * by the Sixth Amendment." *Strickland* at 687, 466 U.S. 668, 104 S.Ct. 2052.

{¶57} In the case sub judice, appellant asserts that trial counsel performed ineffectively in light of counsel's underlying trial strategy. Appellee, however, claims that both appellant and his co-defendant explicitly agreed to this particular strategy, and so informed the trial court on multiple occasions.

{¶58} Generally, a defendant has no right to determine counsel's trial tactics and strategy. *State v. Cowans,* 87 Ohio St.3d 68, 72, 717 N.E.2d 298 (1999); *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 150. Rather, decisions about viable defenses are the exclusive domain of defense counsel, after consultation with the defendant. *Id.*; *State v. Crank*, 5th

Dist. Stark No. 2016CA00042, 2016-Ohio-7203, ¶ 18. "When there is no demonstration counsel failed to research the facts or the law or counsel was ignorant of a crucial defense, a reviewing court defers to counsel's judgment in the matter." *Crank* at ¶ 18, citing *State v. Clayton*, 62 Ohio St.2d 45, 49, 402 N.E.2d 1189 (1980).

{¶59} At trial, witness presentation, questioning and cross-examination falls within the ambit of trial strategy. Debatable trial tactics do not generally establish an ineffective assistance of counsel claim. *State v. Hoffner*, 102 Ohio St.3d 358, 2004-Ohio-3430, 811 N.E.2d 48, ¶ 45. Further, "[e]ven if the wisdom of an approach is questionable, 'debatable trial tactics' do not constitute ineffective assistance of counsel. *State v. Phillips*, 74 Ohio St.3d 72, 85, 656 N.E.2d 643 (1995).

{¶60} Appellant cites *State v. Burgins*, 44 Ohio App.3d 158, 542 N.E.2d 707 (4th Dist.1988) to support his argument that his trial counsel's actions in the case at bar should not be viewed as appropriate trial strategy. Convicted of theft, *Burgins* argued he did not receive effective assistance of counsel when during closing argument, counsel stated that he himself did not believe Burgins, and that he fully expected the jury to find Burgins guilty. This court held that, when a defendant's counsel in a criminal case tells the jury that counsel does not believe counsel's own client,

and counsel also expects the jury to return a guilty verdict, the defendant has been denied the effective assistance of counsel. Although defense tactics, and even ineffective tactics, are usually not considered grounds for reversal, when such a deviation from the norm occurs that ordinary trial counsel would scoff at hearing of it, a reviewing court may reverse a guilty verdict and order a new trial.

{¶61} Appellee, however, points to *State v. May*, 1st Dist. Hamilton No. C-070290, 2008-Ohio-1731. In *May*, the defendant had been charged with both aggravated robbery and robbery, but after counsel stipulated to May's guilt on the robbery charge, the jury found May guilty of robbery, but not guilty of aggravated robbery. On appeal, although May argued he received ineffective assistance, the First District held that unlike *Burgins*, nothing in the record suggested that May had planned to maintain his innocence. *May* at ¶ 9. Moreover, even if May's attorney's stipulations arguably constituted error, because overwhelming evidence of guilt existed, the trial's outcome would not have changed even absent the stipulation. Thus, the court concluded that no prejudice occurred. *Id.* at ¶ 10.

{¶62} Appellee also points to *State v. McGlone*, 4th Dist. Scioto No. 90CA1910, 1992 WL 50021 (Mar.11, 1992), when counsel

admitted guilt on a minor offense to make more credible his

proclamations of innocence on a more serious offenses.  Appellee

contends that the case sub judice is more similar to *May* and

*McGlone* than *Burgins* because, although appellant's co-defendant's

counsel's opening statement admitted the co-defendant's guilt on

the charges of aggravated murder, murder, and felonious assault,

counsel did leave the remaining counts in question "with the

primary goal of attempting to exonerate Daniel Groves from the

Aggravated Murder, Murder, and Felonious Assault counts."  Appellee

thus contends that appellant's strategy actually proved to be

successful because the jury did, in fact, find appellant not guilty

of aggravated murder.  Additionally, as in *May,* nothing in the

record appears to suggest that appellant planned to maintain his

innocence.  In fact, a review of the trial court proceeding

actually suggests the opposite - that appellant openly planned to

concede guilt for his participation in the concealment of Dylan's

body.

{¶63}  In the case at bar, appellant's co-defendant's counsel

gave opening statement as follows:

> \* \* \*
>
> My client, Jessica Groves, was, and still is, a drug
> addict.  There is no doubt about that fact.  She and she
> alone, caused the injuries to Dylan Groves, which lead to

his death.  She murdered Dylan Groves.  She will testify that she murdered Dylan Groves.  She will testify to the injuries that she caused to Dylan Groves.  The two inch fracture on the skull, the one inch fracture on the skull, the half inch laceration on the left arm, fracture of the left humerus, fracture of the left radius and ulna, red contusion on the right side of the chest, healed rib fractures and the drugs in Baby Dylan's system, these are the injuries caused to Dylan Groves by Jessica Groves.

Finally, you might ask why put everybody through this ordeal?  Why put everybody through this trauma?  The answer is because she's going to do the right thing right now.  And that right thing is to take personal responsibility for her crimes and sins.  And that right thing also is to protect and defend an innocent man.

* * * Daniel Groves had nothing to do with the death of Dylan Groves, and he did not cause these injuries.  He was foolishly unaware of these injuries.  And I say foolishly because hindsight is always 20/20, and sometimes you're oblivious to what's going on.  This is especially true for someone that you have loved.

Dylan Groves died on March 28th, and Daniel found him unresponsive.  Once he found him panic and confusion set in.  And with that panic and confusion came poor decision and that we saw - saw here today.  Did he help hide the body? Yes.  Did he suggest the well? Yes.  He knew where this well was.  Did he help craft the coffin and preserve Dylan?  Yes he did.  But that is all he did.

Jessica Groves is the person responsible for the death of Dylan Groves.  She is here in front of you today taking personal responsibility for her crimes, and her sins. Thank you, Your Honor.

Appellant's counsel's gave opening statement as follows:

* * *

[W]e would argue and support that position in this matter

that Ms. Groves is the principal perpetrator in this matter, and this is - - and the position that has actually been held by the State in this case since this case was arraigned right here in this courtroom.

* * *

That will be the position that Mr. Groves will hold. That is the position that actually Jessica Groves is going to own in this matter, as you've heard from the opening statement.

* * *

Ladies and Gentlemen, you heard my co-counsel in this matter the - - Mr. Stratton, who's representing Mrs. Groves talk about how my client participated in helping her dispose the body. You heard Ms. Hutchinson set up here and tell you that my client actually after some misconception that he did lead the law enforcement agency to the recovery of Dylan's body. But that's it, Ladies and Gentlemen, he only helped dispose of the body. He did eventually cooperate with the police, because he couldn't lie about it anymore.

* * *

And I believe you will hear law enforcement come in and talk to you about that.

He led them to where Dylan had been placed. He did not cause the - - his death. He never kidnapped him. He never caused his death. He ever [sic.] endangered him. He never interfered with custody. He never caused harm to this child. He cannot be the source of felonious assault that he has also been charged with. And that's what I want you to listen for. Either that's going to be proven or not proven throughout this case. And it is our position that that will not be proven by the State. That will be accounted for by the actions of Jessica Groves, and she is going to own all of those actions and she will tell you in her own words, or we anticipate her telling you in her own words, how - - whether you call it my

client was blind, whether you call it that he was foolishly unaware as Mr. Stratton pointed out, he may have been, Ladies and Gentlemen, but he had no knowledge. He had no participation.  And he was not the source of the injuries that resulted in Dylan's death.

**{¶64}**  After appellant's co-defendant's counsel's opening statement and admission that appellant's co-defendant alone caused Dylan's death, and acknowledgment that appellant did not participate or cause Dylan's death, the following exchange occurred:

THE COURT: Ms. Groves, you've heard your lawyers opening statement in this matter; is that correct?

DEFENDANT J. GROVES: Yes, Your Honor.

THE COURT: All right.  We had some discussions this morning about your ultimate defense strategy in this matter.  Was that consistent with your strategy as you intend to present your defense in this matter?

DEFENDANT J. GROVES: Yes, Your Honor.

THE COURT: All right.  Have you had plenty of opportunity to consult with him about this strategy?

DEFENDANT J. GROVES: Yes, I have, Your Honor.

THE COURT: You understand that the State still has to prove their case in this matter, regardless of his opening statement?  But do you understand that potentially that - - at least in some respects in this - - Some count of this indictment could - - could harm your changes as to an ultimate outcome. Do you understand that?

DEFENDANT J. GROVES: Yes, sir.

THE COURT: And you've contemplated this before you've proceeded with this strategy; is that correct?

DEFENDANT J. GROVES: Yes, sir.

**{¶65}** As the appellee further points out, appellant concedes that his trial counsel used "a strategy asked for by the Groves for counsel to 'work together,'" but now, on appeal, appellant argues that the "work together" strategy caused him prejudice.

**{¶66}** Initially, we observe that in the case sub judice, the trial court openly, fully and repeatedly discussed this particular trial strategy with appellant and his co-defendant. The court questioned appellant and his co-defendant regarding their satisfaction with counsel, their ability to communicate with counsel, their opportunity to view discovery and the evidence against them, and their opportunity to discuss their cases with their counsel. In fact, the court addressed these issues multiple times at multiple pre-trial hearings on August 1, August 28, October 30, and December 18, 2019. Further, at the start of the trial, appellant's co-defendant's counsel stated, "My client has indicated to me that she intends to testify and that my opening statement and the statements through questioning will have to do with that testifying, and that she wants me to proceed accordingly." Once again, the trial court thoroughly discussed

with appellant and his co-defendant their decision to testify,

including whether they understood their right to testify or not to

testify, and their right to change their decision if they so

desire.

{¶67} Moreover, before appellant's co-defendant took the stand,

she again indicated that she understood the ramifications of her

testimony.  The trial court asked appellant's co-defendant if she

recalled prior discussions about whether to try the cases together

or separately, and the court referenced an earlier *Bruton*

discussion and asked appellant's co-defendant:

> Do you understand that if - - if you do testify in this
> matter, and I can tell you I - - I'm not trying to
> influence you one way or the other.  This is solely your
> decision.  But do you understand that if you do choose to
> testify then some of those statements that the State is
> indicating that they would not be using in this trial may
> then come into evidence?  Do you understand that?

After appellant's co-defendant indicated that she did understand

the ramifications of her decision, the trial court asked appellant

if he understood these matters and that his prior conviction could

be used at trial if he decided to testify.  Appellant indicated

that he did so understand.  The court also reiterated that the co-

defendants could change their decision about whether to testify.

The court also asked appellant's co-defendant if she believed that

she had sufficient information to make her decision, to which she

replied that she did.

**{¶68}** Consequently, in the case sub judice appellant's trial counsel's strategic decision to agree with appellant's co-defendant's counsel's strategic decision to have appellant's co-defendant admit guilt in an attempt to exonerate appellant from the murder charge may arguably be viewed, in hindsight, as questionable, but counsel is, within reason, tasked with following his or her client's wishes.  Generally, attorneys who defer to a client's wishes or directives do not render ineffective assistance. *State v. Reine*, 4th Dist. Scioto No. 06CA3102, 2007-Ohio-7221, citing *State v. Roberts*, 110 Ohio St.3d 71, 2005-Ohio-3665, 850 N.E.2d 1168, ¶ 148; *State v Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, 827 N.E.2d 285, ¶ 100; *Cowans*, 87 Ohio St.3d at 81; *State v. Keith*, 79 Ohio St.3d 514, 536, 684 N.E.2d 47 (1997) (counsel defers to client's desire not to present mitigation evidence not ineffective assistance).

**{¶69}** The deficient performance portion of an ineffective assistance claim "is necessarily linked to the practice and expectations of the legal community: 'The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.' " *Padilla v. Kentucky*, 559 U.S. 356, 366, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010), quoting *Strickland*, 466 U.S. at

688; accord *Hinton v. Alabama*, 571 U.S. 263, 272-273, 134 S.Ct. 1081, 188 L.Ed.2d 1 (2014*)*; accord *State v. Bradford,* 4th Dist. Adams No. 20CA1109, 2020-Ohio-4563*,* ¶ 18.  Prevailing professional norms dictate that "a lawyer must have 'full authority to manage the conduct of the trial.' "  *State v. Pasqualone*, 121 Ohio St.3d 186, 2009-Ohio-315, 903 N.E.2d 270, ¶ 24, quoting *Taylor v. Illinois*, 484 U.S. 400, 418, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988).

{¶70}  Appellant further argues that, although the trial court asked appellant's counsel if she had questions, the court did not ask whether *Bruton* issues existed concerning appellant and his co-defendant's in-court confession.  In *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476, a postal inspector testified regarding a non-testifying co-defendant's confession. The United States Supreme Court held that a defendant is deprived of Sixth Amendment's Confrontation Clause rights when a co-defendant's incriminating confession is introduced at their joint trial, even if the jury is instructed to consider that confession only against the co-defendant.  *Bruton*, 391 U.S. at 126.

{¶71}  However, when a co-defendant testifies, *Bruton* does not usually apply because a defendant then has an opportunity to cross-examine the co-defendant on the accuracy of the statement, thereby removing the confrontation issue.  *See Nelson v. O'Neil,* 402 U.S.

622, 629-30, 91 S.Ct. 1723, 29 L.Ed.2d 222 (1971); *U.S. v. Chrismon*, 965 F.2d 1465 (7th Cir.1992) (ordinarily, Bruton problem avoided if maker of confession testifies at trial); *U.S. v. Myers*, 892 F.2d 642, 645 (7th Cir.1990)(if co-defendant testifies, defendant can confront him all he likes and no Sixth Amendment violation); *State v. Ramirez,* 5th Dist. Richland Nos. 16CA95, 16CA96, 2018-Ohio-595, ¶ 37 (underpinning of *Bruton* is inability to confront and cross-examine a non-testifying co-defendant); *State v. Doherty*, 56 Ohio App.2d 112, 381 N.E.2d 960 (1st Dist. 1978)(defendant given opportunity to cross-examine witness not denied Sixth Amendment confrontation right).  Thus, in view of the foregoing, we do not believe that *Bruton* creates an issue in the case at bar.

**{¶72}** Also critical to this analysis is that, even if, for purposes of argument, we accept appellant's assertion that trial counsel rendered ineffective assistance, we could not conclude that, but for counsel's errors, the result of appellant's trial would have been different.  Courts should not simply assume the existence of prejudice, but instead require that prejudice be affirmatively established.  *Reine* at ¶ 41, citing *State v. Hairston*, 4th Dist. Scioto No. 06CA2089, 2007-Ohio-3707, citing *State v. Clark*, 4th Dist. Pike No. 02CA684, 2003-Ohio-1707, ¶ 22.

Although trial counsel's strategy in the case sub judice, to allow appellant's co-defendant to admit that she caused Dylan's death and appellant to admit that he helped to conceal Dylan's body, may arguably, in hindsight, appear to be unwise, the second portion of the *Strickland* test requires appellant to establish prejudice.  To do so, appellant must demonstrate that a reasonable probability exists that " 'but for counsel's errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine the outcome.' "  *Hinton*, 571 U.S. at 275, quoting *Strickland*, 466 U.S. at 694; *Bradford,* 4th Dist. Adams No. 20CA1109, 2020-Ohio-4563, at ¶ 21; *State v. Short*, 129 Ohio St.3d 360, 2011-Ohio-3641, 952 N.E.2d 1121, ¶ 113; *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph three of the syllabus; *accord State v. Spaulding*, 151 Ohio St.3d 378, 2016-Ohio-8126, 89 N.E.3d 554, ¶ 91 (prejudice component requires a "but for" analysis).

**{¶73}**  Thus, " 'the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.' "  *Hinton*, 571 U.S. at 275, quoting *Stricklan*d, 466 U.S. at 695.  As noted above, courts ordinarily may not simply presume the existence of prejudice but, instead, must require a defendant to affirmatively establish

prejudice.  *Bradford* at ¶ 21; *State v. Clark*, 4th Dist. Pike No.
02CA684, 2003-Ohio-1707, ¶ 22; State v. Tucker, 4th Dist. Ross No.
01CA2592, 2002 WL 507529 (Apr. 2, 2002).  As this court has
previously recognized, speculation is insufficient to establish the
prejudice component of an ineffective assistance of counsel claim.
*Bradford, supra; State v. Tabor*, 4th Dist. Jackson No. 16CA9, 2017-
Ohio-8656, ¶ 34; *State v. Jenkins*, 4th Dist. Ross No. 13CA3413,
2014-Ohio-3123, ¶ 22; *State v. Simmons*, 4th Dist. Highland No.
13CA4, 2013-Ohio-2890, ¶ 25; *State v. Halley*, 4th Dist. Gallia No.
10CA13, 2012-Ohio-1625, ¶ 25; *State v. Leonard*, 4th Dist. Athens
No. 08CA24, 2009-Ohio-6191, ¶ 68; *accord State v. Powell*, 132 Ohio
St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 86 (purely speculative
argument cannot serve as basis for ineffectiveness claim).

{¶74}  In the case sub judice, our review reveals that at trial
appellee presented 20 witnesses and 79 exhibits.  The jury heard,
inter alia, that appellant: (1) failed to maintain contact with
SCCS, (2) failed to supervise his co-defendant, (3) served as
Dylan's sole custodian at the time of his death, (4) admitted he
observed his co-defendant physically injure Dylan and the cause of
death was homicidal violence by blunt force trauma, (5) assisted
his co-defendant to conceal Dylan's body, (6) repeatedly lied to
SCCS and to other authorities, (7) knowingly misled authorities to

the wrong location of Dylan's body, (8) led authorities to the

actual location of Dylan's body, and (9) made jailhouse statements

that revealed his knowledge of Dylan's injuries and, inter alia,

his admission that he concealed Dylan's body.

{¶75}   Therefore, we believe that appellee adduced overwhelming

evidence at trial, including witness testimony and physical

evidence, to prove the elements of the crimes beyond a reasonable

doubt.   Thus, we do not believe that appellant's trial counsel's

performance prejudiced appellant and changed the outcome of his

trial.

### B.   Alleged Cumulative Failures

#### 1.   Failure to File a Written Motion for Change of Venue

{¶76}   Appellant asserts that after *voir dire*, his trial counsel

rendered ineffective assistance when she made an oral motion for a

change of venue "unsupported by voluminous evidence of pervasive

pretrial publicity."   Appellant recognizes that, because almost all

of the approximately 63 individuals questioned during voir dire

expressed that they had either read, discussed or heard about this

matter through some form of media or family discussion, appellant's

trial counsel did, in fact, make an oral motion for a change of

venue that the trial court denied.   Nevertheless, appellant argues

that, in light of all the available information to support a change of venue, trial counsel should have formulated a more thorough, detailed written motion and included supporting materials to better attempt to persuade the court to change the trial's venue.

**{¶77}** Generally, the standard of review appellate courts use to review a trial court's denial of a motion to change venue is the abuse of discretion standard. *State v. Garvin*, 197 Ohio App.3d 453, 2011-Ohio-6617, 967 N.E.2d 1277 (4th Dist.), ¶ 34, citing *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, at ¶ 23. Thus, appellate courts should reverse trial court decisions regarding change of venue only upon a clear showing of an abuse of a trial court's discretion. *Id.*, citing *State v. Metz*, 4th Dist. Washington No. 96CA48, 1998 WL 199944 (Apr. 21, 1998), citing *State v. Gumm*, 73 Ohio St.3d 413, 430, 653 N.E.2d 253 (1995). The term abuse of discretion implies that a court's attitude is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983), quoting *State v. Adams,* 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

**{¶78}** The Supreme Court of Ohio addressed the issue of pretrial publicity in *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, 850 N.E.2d 1168. In *Roberts,* the defendant-wife and her lover

plotted to kill the defendant's husband, and both were convicted of aggravated murder.  The court noted that, although a great deal of publicity occurred in Trumbull County about the murder and the trial, the defendant nevertheless failed to show that media coverage "so saturated the county and influenced the potential venire that she was deprived of a fair trial."  *Id.* at ¶ 115.  "A defendant claiming that pretrial publicity denied her a fair trial must show that one or more jurors were actually biased."  *State v. Treesh*, 90 Ohio St.3d 460, 464, 739 N.E.2d 749 (2001).  Moreover, "[p]retrial publicity - even pervasive, adverse publicity - does not inevitably lead to an unfair trial."  *Nebraska Press Assn. v. Stuart,* 427 U.S. 539, 554, 96 S.Ct. 2791, 49 L.Ed.2d 683.  Only in rare cases is prejudice presumed.  *Treesh,* 90 Ohio St.3d at 464, 739 N.E.2d 749.

{¶79}  The United States Supreme Court has observed that "Prominence does not necessarily produce prejudice, and juror *impartiality* does not require *ignorance."*  *Skilling v. U.S.*, 561 U.S. 358, 381, 130 S.Ct. 2896, 177 L.Ed.2d 619 (2010), citing *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) (Jurors not required to be "totally ignorant of facts and issues involved; scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the

merits of the case.); *Reynolds v. United States*, 98 U.S. 145, 155-156, 25 L.Ed. 244 (1898)([E]very case of public interest is almost, as matter of necessity, brought to attention of intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits.).

{¶80}  In the case sub judice, after trial counsel's oral motion for a change of venue, the trial court noted that, although most of the jurors indicated that they had heard something about the case, all prospective jurors indicated during voir dire that, if chosen, they "could base their decision solely on the evidence and testimony presented in the courtroom, put aside what they had learned, to whatever extend [sic.] that was to each individual juror, from other sources and that they would be fair and impartial to both sides, and they indicated that they could follow the law as instructed by the Court."

{¶81}  While we recognize and acknowledge that the case sub judice generated an inordinate amount of publicity, both locally and nationally, after our review of the record, and in light of the trial court's questions posed to prospective jurors and their responses, we cannot conclude that appellant established that the trial court's decision to overrule the change of venue request

constitutes an abuse of discretion, or that a more fully supported motion would have persuaded the court to change the trial's location.  We find nothing in the record to support the claim that the jurors could not fairly and impartially consider the evidence and arrive at a fair and just verdict.

### 2.   Failure to Move for a Separate Trial

**{¶82}**  Appellant asserts that because he now believes that, in his view, his joint trial with his co-defendant constituted prejudicial joinder, his trial counsel's failure to request a separate trial amounts to ineffective assistance of counsel.

**{¶83}**  This court wrote in *State v. Evans,* 4th Dist. Scioto No. 08CA3268, 2010-Ohio-2554, ¶ 41, that, as a general rule, the law favors joinder of defendants and the avoidance of multiple trials because it " 'conserves judicial and prosecutorial time, lessens the not inconsiderable expenses of multiple trials, diminishes inconvenience to witnesses, and minimizes the possibility of incongruous results in successive trials before different juries.' "  *State v. Daniels*, 92 Ohio App.3d 473, 484, 636 N.E.2d 336 (1st Dist.1993), quoting *State v. Thomas*, 61 Ohio St.2d 223, 225, 400 N.E.2d 401 (1980); *see also State v. Goodner,* 195 Ohio App.3d 636,

2011-Ohio-5018, 961 N.E.2d 254, ¶ 39, citing *State v. Schaim*, 65

Ohio St.3d 51, 58, 600 N.E.2d 661 (1992); *State v. Torres*, 66 Ohio

St.2d 340, 343, 421 N.E.2d 1288 (1981).

{¶84}  To establish that a trial court's refusal to sever a

trial constitutes prejudicial error, a defendant must establish:

"(1) that his rights were prejudiced, (2) that at the time of the

motion to sever, he provided the trial court with sufficient

information so that it could weigh the considerations favoring

joinder against the defendant's right to a fair trial, and (3) that

given the information provided to the court, it abused its

discretion in refusing to separate the charges for trial."  *Schaim,*

65 Ohio St.3d at 59, citing *Torres,* 66 Ohio St.2d 340 at syllabus;

*Evans* at ¶ 42.  A trial court's refusal to grant a request for

severance, when the prejudicial aspects of joinder are too general

and too speculative, does not constitute an abuse of discretion.

*Evans* at ¶ 42, citing *State v. Payne*, 10th Dist. Franklin No. 02AP–

723, 02AP-725, 2003–Ohio–4891.  Once again, a trial court abuses

its discretion when it acts unreasonably, arbitrarily, or

unconscionably.  *Adams, supra,* at 157.

{¶85}  In the case sub judice, appellant asserts that his trial

counsel ignored a plethora of case law regarding prejudicial

joinder and that his co-defendant's confession created prejudice.

One example of this contention that appellant cites is *State v. Rosen*, 151 Ohio St. 339, 86 N.E.2d 24 (1949). In *Rosen*, different counsel represented the defendants, but because they had antagonistic defenses, the court held that the refusal to permit cross-examination on rebuttal caused prejudice "[w]here it is disclosed, preceding the trial of co-defendants jointly charged with the commission of a felony, that a signed confession by one of the defendants, made in the absence of his co-defendants, will be put in evidence, which confession contains statements showing the guilt of a co-defendant, and based thereon an application for separate trial is duly made by that co-defendant, it is the duty of the trial court either to grant the application or to order the prejudicial matter withheld or deleted before admitting the confession in evidence." *Rosen* at syllabus.

**{¶86}** As noted above, however, *Rosen* involved defendants with mutually antagonistic defenses. Generally, defenses are mutually antagonistic when each defendant attempts to exculpate himself or herself and, instead, inculpate his or her co-defendant. *Daniels*, 92 Ohio App.3d at 486, 636 N.E.2d 336. In the case at bar, appellants did not maintain mutually antagonistic defenses. Rather, their defenses were congruous in that they agreed, as part of their trial strategy, that appellant's co-defendant would admit

that she alone caused Dylan's death and appellant would admit that he helped to dispose of Dylan's body.

{¶87} Furthermore, even assuming arguendo that appellant's and his co-defendant's defenses were mutually antagonistic, mutually antagonistic defenses are not prejudicial per se. *Evans,* 4th Dist. Scioto No. 08CA3268, 2010-Ohio-2554, ¶ 43, citing *Zafiro v. U.S.* (1993), 506 U.S. 534, 538, 113 S.Ct. 933, 122 L.Ed.2d 317. To establish prejudice that results from mutually antagonistic defenses, "the defenses must be antagonistic to the point of being irreconcilable and mutually exclusive." *State v. Walters*, 10th Dist. Franklin No. 06AP-693, 2007-Ohio-5554, at ¶ 23, citing *U.S. v. Berkowitz*, 662 F.2d 1127, 1133 (5th Cir., 1981). In other words, the essence or core of the defenses must be in conflict, such that the jury, in order to believe the core of one defense, must necessarily disbelieve the core of the other. *Walters* at ¶ 23.

{¶88} In the case sub judice, both co-defendants testified at trial. The essence of their testimony---that appellant's co-defendant alone caused Dylan's death and appellant assisted in disposing of Dylan's body---is not in conflict. Thus, we cannot conclude that counsel's failure to request to sever the cases constitutes ineffective performance. Moreover, as stated above,

the trial court thoroughly discussed this trial strategy with appellant and his co-defendant to ensure they understood all the ramifications of their plan.  Although somewhat unusual, both counsel respected, and followed, their client's wishes.

{¶89}  Moreover, we once again point out that, even without appellant's co-defendant's testimony, the jury would have heard testimony that appellant: (1) had sole custody of Dylan at the time of his death, (2) admitted he observed appellant physically injure Dylan and his cause of death was homicidal violence by blunt force trauma, (3) failed to maintain contact with SCCS, (4) failed to supervise his co-defendant, (5) assisted in concealing Dylan's body, (6) repeatedly lied to SCCS and to other authorities, (7) led authorities to a false location to recover Dylan's body, then led authorities to the actual location, and (8) most incriminating, made statements while incarcerated when he spoke with his co-defendant:

> When they took me out there yesterday - - wanted me to take them to where he was at, and I took them - - some bullshit place because - - don't tell them where he is because if they find his body - - * * * and if they find out where he had a broken arm and shit, we're fucked.

{¶90}  In view of all of the foregoing, after our review we conclude that appellant has not demonstrated that his trial

counsel's failure to file a motion to sever his trial from his co-defendant's trial prejudiced him.

    3.  Failing to File a Written Motion for a Separate
    Sentencing Hearing with Facts in Mitigation


**{¶91}** Appellant asserts that his trial counsel's failure to file a written motion for a separate sentencing hearing, along with including supporting facts in mitigation, constitutes ineffective assistance of counsel.

**{¶92}** As a preliminary matter, we point out that appellant does not provide any case authority regarding this issue.  Our review, however, reveals that, in general, a trial counsel's decision to defer to a client's desire to not present mitigation evidence does not constitute ineffective assistance.  The Supreme Court of Ohio has held that a defendant is entitled to decide what he or she wants to argue and present as mitigation.  See, e.g., *Jenkins*, 15 Ohio St.3d at 189, 15 OBR 311, 473 N.E.2d 264, citing *Lockett v. Ohio* (1978), 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973. This includes the decision to present no evidence.  *Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, 850 N.E.2d 1168, ¶ 140.  Thus, an attorney's decision to decline to present mitigation evidence, in

deference to a client's desires, does not constitute ineffective legal assistance. *Id.* at ¶ 148, citing *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, 827 N.E.2d 285, ¶ 100; *Cowans*, 87 Ohio St.3d 68, 81, 717 N.E.2d 298 (1999); *Keith*, 79 Ohio St.3d 514, 536, 684 N.E.2d 47 (1997). *See also State v. Armor*, 2017-Ohio-396, 84 N.E.3d 181 (10th Dist.) (defendant failed to show counsel's failure to properly investigate and present mitigating evidence prejudiced the defendant when record did not show what information counsel's investigation would have revealed and whether such information could have aided defendant).

**{¶93}** While we do not know from our review of the record what discussions may, or may not, have occurred between appellant and trial counsel regarding this issue, we believe that appellant did not establish prejudice arising from trial counsel's failure to present mitigating evidence at sentencing. Because we do not know what information may have been revealed after an investigation, and whether such information could have benefitted appellant, we may not simply engage in speculation in order to determine that appellant suffered prejudice.

### 4.  Waiving Attendance at Jessica Groves' Competency Hearing

**{¶94}**  Appellant asserts that his counsel performed ineffectively when she (1) waived her attendance at appellant's co-defendant's competency hearing, and (2) opted not to receive the results of appellant's co-defendant's competency evaluation. Appellant does not, however, present any additional facts or details about this argument, nor citations to authority for this proposition.

**{¶95}**  In the case sub judice, after appellant's co-defendant's competency evaluation, the trial court found her competent to stand trial.  We find nothing in the record to question the competency evaluation proceeding, or perceive any benefit that may have flowed to appellant.  In *Cowans v. Bagley*, 639 F.3d 241,(6th Cir. 2011), the Sixth Circuit concluded that defense counsel's failure to request a competency hearing did not prejudice the defendant, and, therefore, did not amount to ineffective assistance of counsel when the results of the trial would not have changed.  *Id*. at 250.  If counsel's failure to request a competency hearing for his or her own client does not amount to ineffective assistance, it is difficult to conceive that counsel's waiver of appellant's attendance at his co-defendant's competency hearing, and a review

of that competency evaluation, amounts to ineffective assistance of counsel.  Consequently, this argument requires us to speculate about the information that could have been available to appellant and whether such information would have provided any benefit

{¶96}  Therefore, we disagree with appellant's assertion that his trial counsel's failure to become involved in appellant's co-defendant's competency evaluation constitutes ineffective assistance of counsel.

{¶97}  Accordingly, based upon the foregoing reasons, we overrule appellant's first assignment of error.

II.

{¶98}  In his second assignment of error, appellant asserts that the trial court's failure to provide the jury the R.C. 2923.03(D) cautionary instruction constitutes plain error.  Appellant claims that, if the court had given the instruction, a different outcome would have occurred at trial.

{¶99}  In particular, appellant argues that, after the trial court learned of appellant's co-defendant's intention to testify, the court at that point should have asked appellant if he wished to proceed with a joint trial, or if he had been counseled regarding his decision to go forward with a joint trial.  Appellant further contends that, because his co-defendant could be viewed as his

accomplice and her testimony could be construed to be damaging to appellant, his co-defendant's trial testimony also required the court to charge the jury with the R.C. 2923.03(D) cautionary instruction.

{¶100} First, we point out that, as we addressed in our discussion under appellant's first assignment of error, appellant's co-defendant's counsel's opening statement fully acknowledged appellant's co-defendant's guilt and her intention to take sole responsibility for the acts that led to Dylan's death. Appellant, however, argues that in actuality his co-defendant did not, in fact, do so, but instead argues that her testimony is a mix of blame shifting, denial, and, "by any standard antagonistic to Appellant's defense." Thus, appellant claims, the trial court's failure to give the jury the R.C. 2923.03(D) instruction constitutes plain error.

{¶101} As appellant correctly observes, appellant's trial counsel did not request the trial court to give a cautionary jury instruction on the issue of accomplice testimony. Consequently, all but plain error has been waived. *State v. Hunt*, 4th Dist. Scioto No. 17CA3811, 2018-Ohio-4183, ¶ 67, citing *State v. Steele*, 138 Ohio St.3d 1, 2013-Ohio-2470, 3 N.E.3d 135, ¶ 29; *State v. Mockbee*, 2013-Ohio-5504, 5 N.E.3d 50, ¶ 24 (4th Dist.); Crim.R.

52(B).  "To constitute plain error, a reviewing court must find (1)

an error in the proceedings, (2) the error must be a plain, obvious

or clear defect in the trial proceedings, and (3) the error must

have affected 'substantial rights' (i.e., error must have affected

the trial's outcome)."  *State v. Dickens*, 174 Ohio App.3d 658,

2008-Ohio-39, 884 N.E.2d 92, ¶ 31 (4th Dist.), citing *State v.*

*Hill*, 92 Ohio St.3d 191, 749 N.E.2d 274 (2001), and *State v.*

*Barnes*, 94 Ohio St.3d 21, 27, 2002-Ohio-68, 759 N.E.2d 1240.

"Furthermore, notice of plain error must be taken with the utmost

caution, under exceptional circumstances, and only to prevent a

manifest miscarriage of justice."  *Id.*, citing *State v. Landrum*, 53

Ohio St.3d 107, 111, 559 N.E.2d 710 (1990), and *State v. Long*, 53

Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the

syllabus.  "A reviewing court should notice plain error only if the

error seriously affects the fairness, integrity, or public

reputation of judicial proceedings."  *Id.  Accord State v. Lewis,*

4th Dist. Ross No. 14CA3467, 2015-Ohio-4303, ¶ 9.

{¶102} In the case sub judice, it is undisputed that appellant

and his co-defendant functioned as accomplices.  Also undisputed is

the fact that the trial court (1) did not give the R.C. 2923.03(D)[4]

---

4       R.C. 2923.03(D) provides:
    If an alleged accomplice of the defendant testifies

accomplice jury instruction, and (2) neither counsel requested the trial court to give the accomplice jury instruction.

**{¶103}** " 'Ohio courts generally look to three factors to determine whether a trial court's failure to give the accomplice instruction constitutes plain error: (1) whether the accomplice's testimony was corroborated by other evidence introduced at trial; (2) whether the jury was aware from the accomplice's testimony that [he/she] benefitted from agreeing to testify against the defendant; and/or (3) whether the jury was instructed generally regarding its jury to evaluate the credibility of the witnesses and its province to determine what testimony is worthy of belief.' " *State v.*

---

against the defendant in a case in which the defendant is charged with complicity in the commission of or an attempt to commit an offense, an attempt to commit an offense, or an offense, the court, when it charges the jury, shall state substantially the following:

"The testimony of an accomplice does not become inadmissible because of his complicity, moral turpitude, or self-interest, but the admitted or claimed complicity of a witness may affect his credibility and make his testimony subject to grave suspicion, and require that it be weighed with great caution.

It is for you, as jurors in all the light of all facts presented to you from the witness stand, to evaluate such testimony and to determine its quality and worth or its lack of quality and worth."

*Bentley*, 11th Dist. Portage No. 2004-P-0053, 2005-Ohio-4648, ¶ 58, quoting *State v. Woodson*, 10th Dist. Franklin No. 03AP-736, 2004-Ohio-5713, ¶ 18. "[I]f the first factor and one other factor are present, the absence of the accomplice instruction will not affect the outcome of the case." *Woodson* at ¶ 18.

**{¶104}** Concerning the first factor in interpreting a previous version of R.C. 2923.03, Ohio courts have held that corroborative evidence need only be some evidence, independent of the accomplice's statement, that tends to connect the defendant with the crime charged. It appears that this "other evidence" need not necessarily be of sufficient strength, by itself, to constitute proof beyond a reasonable doubt, but must directly, or by reasonable inference, connect the defendant with the crime. *State v. Allsup*, 67 Ohio App.2d 131, 135-136, 426 N.E.2d 499 (3d Dist.1980); *State v. Johnson*, 4th Dist. Vinton No. 06CA650, 2007-Ohio-2176, ¶ 39.

**{¶105}** In the case at bar, we believe that ample evidence adduced at trial corroborated appellant's co-defendant's testimony. As we indicated above, 20 prosecution witnesses testified concerning the facts in this case, including appellant's lack of interest in Dylan at the hospital, his failure to supervise Dylan

at home, his flight from law enforcement, his lies to investigators, his decision to eventually lead authorities to Dylan's body, and ultimately, his admission about his role in the crimes.  Consequently, because ample evidence corroborated appellant's co-defendant's testimony, we conclude that the first factor has been satisfied.

{¶106} With regard to the second factor, we first point out that appellant's co-defendant did not testify *against* appellant. Rather, she testified:

Q [Jessica's Counsel Mr. Stratton]: Jessica, did you, and you only, cause the death of your son, Dylan Groves?

A: Yes.

Q: Did Daniel Groves participate in the killing of Dylan?

A: No.

Q: Was Daniel Groves aware of any of the injuries that you caused Dylan that may have led to his death?

A: No.

Q: Did you hide all the injuries that you caused Dylan from your husband?

A: Yes.

* * *

Q: Jessica Groves, the injuries that Dylan sustained happened on what date?

A: On March 27th.

Q: Dylan died on what date?

A: March 28th.

* * *

Q: Where did you take Dylan after he died?

A: He was at our house for a couple days.

Q: And then where did you take him?

A: To the well.

Q: Did you murder Dylan Groves?

A: Not intentionally.

**{¶107}** On cross-examination, appellee inquired about how appellant's co-defendant caused Dylan's death, to which his co-defendant replied, "[i]t was an accident."  When asked about details concerning the rib fractures, she replied, "by dropping him."  When asked about the skull fractures, she said "I don't remember. * * * It had to be from dropping him."  When asked about the upper arm fracture, she replied "Nothing that I ever did was intentional. * * * I have to live with this for the rest of my life."  When asked for details about how she caused Dylan's death, she told the prosecutor, "I've admitted to my guilt. * * * And I have to live without - - my children. * * *  I'm done talking to you."  When admonished that she must submit to cross-examination or her testimony would be stricken, she then responded to most

questions, "I don't remember."  Eventually, she stated that she did not have a clear mind "because of drugs."  However, she did, in fact, testify that appellant, her husband co-defendant, did not assist with or cause Dylan's death, but did participate in the preparation and concealment of Dylan's body.  Further, on cross-examination appellant's co-defendant testified:

Q: Who wrapped this baby's body in six layers of plastic and duct tape? Who did that?

A: I did.

Q: You did? Daniel Groves didn't help you with that?

A: Yes, he did.

Q: Tell them what happened.  Tell them about that concealment.

A: I wanted to be able to go back and get my baby.

* * *

Q: Who drove Baby Dylan out to that well?

A: We both did.

Q: Tell the jury how that happened and what you did.

A: We took him out to the well . . . We put him in the well and we sit in the field and cried.

{¶108} As appellee points out, the only testimony that appellant's co-defendant provided implicated appellant in the crimes of tampering with evidence and gross abuse of a corpse,

crimes that appellant actually admitted. Here, we agree with appellee that this is not testimony *against* appellant, when one considers all of the evidence presented. Furthermore, as appellee indicates, the trial court's jury instructions in the case sub judice thoroughly defined the terms complicity, aiding and abetting, how complicity may be proven, the intent required, and the knowledge that another was committing an offense.

{¶109} Although we also recognize that appellant's co-defendant did not offer many details about the precise manner of Dylan's death, she did clearly testify that appellant did not participate in Dylan's death, but instead, participated only in preparing Dylan's body to be concealed in the well, then helping to carry-out that plan. Consequently, we do not believe that appellant's co-defendant testified "against" appellant. Moreover, we recognize that the trial court also instructed the jury generally regarding the jury's duty to evaluate witness credibility.

{¶110} Thus, after our review, we believe that the trial court satisfied the third factor. Consequently, we cannot say that the trial court's failure to give the accomplice instruction would have altered the trial's outcome. After our review of all of the evidence presented at trial, and the trial court's general credibility instruction, we cannot conclude that the absence of a

R.C. 29323.03(D) instruction constitutes plain error.

{¶111} Appellant further asserts that his trial counsel's failure to either request the R.C. 2923.03(D) jury instruction, or object to its omission, constitutes ineffective assistance of counsel. However, as we point out above, even if appellant's trial counsel's performance was arguably deficient or unreasonable under the circumstances, we nevertheless conclude that appellant's claim must fail. Here, appellant cannot demonstrate a reasonable probability exists that, but for trial counsel's arguable errors, the result of appellant's trial would have been different.

{¶112} In the case at bar, SCCS released Dylan to appellant. From the start, appellant failed to maintain contact with SCCS as required, lied about his employment, and failed to supervise his co-defendant's visitation. When law enforcement, armed with a search warrant, visited appellant's home to look for Dylan, appellant failed to comply with their request to exit the home and, when questioned, lied and said that SCCS had taken the child. Moreover, after appellant initially lied to law enforcement about the location of Dylan's body, appellant eventually led officers to the actual location of Dylan's body. Appellant also admitted that he observed his co-defendant "hit [Dylan] probably four times." Most important, as we indicated above, during their jailhouse

discussion appellant told his co-defendant, "If they find his body and if they find out where he had a broken arm and shit, we're fucked.  It don't matter."  Consequently, after our review, we conclude that the trial court's failure to provide a R.C. 2923.03(D) cautionary instruction does not constitute plain error.

{¶113} Accordingly, based upon the foregoing reasons, we overrule appellant's second assignment of error and affirm the trial court's judgment.

JUDGMENT AFFIRMED.

JUDGMENT ENTRY

It is ordered that the judgment be affirmed.  Appellee shall recover of appellant the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Scioto County Common Pleas Court to carry this judgment into execution.

If a stay of execution of sentence and release upon bail has been previously granted, it is continued for a period of 60 days upon the bail previously posted.  The purpose of said stay is to allow appellant to file with the Ohio Supreme Court an application for a stay during the pendency of the proceedings in that court. The stay as herein continued will terminate at the expiration of the 60-day period.

The stay will also terminate if appellant fails to file a notice of appeal with the Ohio Supreme Court in the 45-day period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Ohio Supreme Court.  Additionally, if the Ohio Supreme Court dismisses the appeal prior to the expiration of said 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Hess, J.: Concur in Judgment & Opinion

For the Court

BY:_____
Peter B. Abele, Judge

NOTICE TO COUNSEL

Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.